WICKER, J.
Defendant, Chamid Davis, appeals his conviction and sentence for second degree murder in violation of La. R.S. 14:30.1. For the following reasons, we affirm defendant's conviction and sentence.
*1125 STATEMENT OF THE CASE
On January 28, 2016, a Jefferson Parish Grand Jury returned an indictment charging defendant, Chamid J. Davis, with second degree murder in violation of La. R.S. 14:30.1.[1] Defendant was arraigned and pled not guilty.
On May 1, 2017, the State filed a "Notice of Intent to Introduce Evidence" at trial under La. C.E. art. 404(B) to prove that defendant had access to one of the firearms used in the commission of the murder. Following a hearing, the trial court found the evidence relevant and admissible and granted the State's notice of intent.
The matter proceeded to trial, and on March 23, 2018, a twelve-person jury returned a verdict of guilty as charged. On March 29, 2018, defendant filed a "Motion for New Trial and for Post-Verdict Judgment of Acquittal," which the trial court denied. After defendant waived delays, the trial court sentenced defendant to life imprisonment at hard labor with the benefit of parole eligibility.[2] On April 6, 2018, defendant filed a motion to reconsider sentence, which the trial court denied. This timely appeal follows.
FACTS
This case involves the October 19, 2015 murder of Kevin Thomas, Jr., who was fifteen years old at the time he was shot multiple times outside of his apartment building at 1001 Sycamore Drive in Westwego, Louisiana. Kevin's mother, Marilyn Jackson, testified that she was sitting on the sofa in her apartment when Kevin left the apartment at approximately 12:20 a.m. to go outside. She testified that minutes later, she heard "shots," so she went outside and saw Kevin running toward the apartment. She opened the apartment door to let him in, where he collapsed on the floor. Ms. Jackson called the police.
Officer Jessica Bergeron Wayner with the Westwego Police Department responded to the call and assessed Kevin until emergency medical services arrived. Officers canvassed the apartment building and the surrounding area searching for eyewitnesses to no avail. However, during their inspection of the perimeter of the apartment building, officers discovered a clear bag with green vegetable matter, fired cartridge casings, and projectile fragments, which officers collected as evidence. Officers also observed a trail of blood leading from the area where most of the casings and projectiles were found to the direction of Kevin's apartment.
Officers detected the smell of marijuana upon entering the apartment and subsequently obtained a search warrant. In Kevin's bedroom, officers located fifteen individual baggies containing green leafy vegetable matter and a digital scale. Officers also found a High Point .40 caliber pistol, which the police learned was stolen. The coroner investigation revealed a small pill bottle with a clear baggy of green vegetable matter hidden inside the underwear Kevin was wearing at the time of the murder. From their initial investigation, officers suspected that Kevin was a marijuana distributor.
During the search of the apartment, officers also found Kevin's cell phone, and his mother provided the password.[3] Police discovered that at 12:20 a.m., immediately before the murder, Kevin received a text *1126 message from cell phone number (504) 509-XXXX, seemingly asking to purchase marijuana from Kevin. Investigating officers suspected the owner of the cell phone had lured Kevin outside with the intent to shoot him.
As part of the investigation, Detective Christopher Fisher requested an exigent circumstances records request of cell phone number (504) 509-XXXX from T-Mobile Cellular Telephone Company (T-Mobile), wherein he sought to obtain current subscriber information, call detail records with cell site, call records, and real-time location of the mobile device. Detective Fisher learned that the cell phone number that contacted Kevin shortly before he was murdered was registered to a Jessica Coleman, later adduced to be defendant's aunt, whom he lived with in Gretna. He also learned from review of the records that shortly after the murder, the cell phone number was disconnected and changed. With this information, on October 20, 2015, at approximately 5:03 p.m., Detective Fisher and other officers went to speak with Jessica Coleman, who confirmed that the cell phone number belonged to defendant.
At the time of the murder, Johnneika Honor, age sixteen, was defendant's girlfriend and also knew the victim, whose nickname she provided as "Little Kevin."[4] She also knew co-defendant Hughes and how close Hughes and defendant were. On October 22, 2015, Detective Tyler Lopez and Sergeant Nocito interviewed Johnneika, initially as a witness, at the Westwego Police Department. She told the interviewing detectives that defendant was her boyfriend and provided both defendant's old and new cell phone numbers. She provided that she discovered on Instagram that Kevin was dead and heard at school that the person who set him up had called Kevin's phone that night. Johnneika told the detectives that defendant was at her house on the night of the murder from 10:00 p.m. to 3:00 a.m., and that he was picked up and dropped off in a black Charger. Because the officers suspected she was being dishonest, they asked Johnneika to fill out a waiver of rights form and give a statement. Both Johnneika and her legal guardian, Arnetta Harris, who was present, consented for police to search Johnneika's cell phone. On her phone, police saw text messages from the phone number that called Kevin moments before he was murdered. There was also a text message between defendant and Johnneika after the murder, where Johnneika told defendant that "Little Kevin nem dead," and defendant responded, "I know but delete that message don't even speak on that."
After detectives confronted her with the text messages, Johnneika told detectives that defendant and Kevin were "beefing" because Kevin broke into defendant's aunt's car and stole a gun. Eventually, Johnneika admitted that defendant confessed to her that he called Kevin from his phone on the night of the murder and pretended to be someone else and that he and Hughes shot Kevin in the back as he fled. She also stated that defendant and Hughes had come to her house after the murder that night in a large gray truck because Hughes was supposed to bring her a phone. Arnetta stated that she too saw a gray truck as she arrived home that night.[5]
*1127 Johnneika further indicated during the interview that defendant had changed his cell phone number the morning after the murder occurred because he realized he made a mistake by calling Kevin from his phone.[6] After the interview with Johnneika, Hughes and defendant were developed as suspects and arrest warrants issued. Defendant eventually turned himself in.
The cell phone extraction report from Johnneika's cell phone revealed additional text messages between Johnneika and defendant which were not on her phone at the time of the interview because they had been deleted. These text messages further confirmed that defendant had changed his number after the murder. When Johnneika texted defendant asking him why he changed his number and if it was because of "that stuff," defendant replied to stop texting "about that" and then called her.
There were also text messages between the two on October 21, 2015, indicating that they were arguing over defendant seeing other girls. Johnneika wrote for defendant to ask "one of them other hoes you fw to lie withcuu," and defendant responded "Know what f**k you son. I get jammed up ima just take my lick" and that he "shouldna trusted telling you that's where I f**ked up I think." There also existed text messages between Johnneika and Hughes wherein Johnneika wrote that another person was trying to take the credit for Kevin's murder, but she indicated that defendant had "said that's his work."
Johnneika's cell phone extraction also revealed that on October 20, 2015, at approximately 5:46 p.m., at which time the police were at defendant's aunt's home, Hughes texted Johnneika to call him as soon as possible and that it was important. Johnneika and Hughes spoke on the phone, and later, Johnneika texted Hughes: "Is he going to jail?" Hughes responded that he did not know but that "he gonna beat that charge, all they have is a phonecall ... Long as u stick ur part ... he straight!" Johnneika wrote to Hughes that she knew what to say. Detectives connected this message with Johnneika's attempt to lie about defendant's whereabouts on the night of the murder in her interview two days later.
The cell phone extraction report for Kevin's cell phone corroborated that defendant and Hughes had "beef" over Kevin allegedly stealing a gun out of defendant's aunt's car. On September 6, 2015, Kevin texted his friend that "Madge and them" had "beef" and for them to "[g]et ready to squeeze" because the "hammer's in they car." Lieutenant Eric Orlando with the Westwego Police Department explained that "hammer" is slang for a gun, and "squeeze" was a term for a theft. On September 8, 2015, Kevin received a text asking for a picture of the "Glock ... So I could see about the lick."[7] Kevin responded to the text by sending a picture of a .10 mm Glock. A text message was also found on Kevin's phone from Hughes which read: "Came up on a 10 milly glissy tonight, huh," which Lieutenant Orlando explained was a slang term for a .10 mm Glock, and defendant also sent a text message to Kevin asking or indicating that Kevin "came up on a glissy 10 last night."
Jene Rauch, an expert in the field of firearm and tool-mark examination, performed *1128 ballistic analysis on the nine .9 mm fired cartridge casings, copper jackets, projectiles, and bullet fragments collected outside of Kevin's apartment by the crime scene technicians, as well as the two projectiles recovered from Kevin's body during the autopsy. She determined that the nine cartridge cases were fired from two separate firearms, but the two projectiles recovered from Kevin's body during the autopsy were fired from the same weapon.
An analysis of the national database revealed that the ballistics involved in the murder matched that of two firearms previously entered into the system. The ballistic analysis determined that a .9 mm Ruger had been fired at the scene of the murder, but the projectiles recovered from Kevin's body did not match the ballistics from the Ruger.[8]
Rather, the projectiles found inside Kevin's body and the remaining casings found at the scene matched a .9 mm pistol. The database showed that the same weapon was used in an unrelated shooting on October 10, 2015, involving defendant's cousin, Daniel Bryant, on Frenchman Street,[9] and a second unrelated shooting on October 16, 2015, on Frenchman and North Claiborne. Lieutenant Eric Orlando testified that it was common for guns to be disposed, traded, or sold after they are used in the commission of crimes. He theorized that the fact that defendant lived with his cousin, Daniel, provided defendant with direct access to the weapon close in time to the murder.
Detective Donald Zanotelli with the Jefferson Parish Sheriff's Office examined the cell site location information of defendant's and Hughes' cell phones by plotting the latitude and longitude locations of the cell phone towers their cell phones communicated with leading up to and during the time of the murder.[10] He testified that the results indicate the whereabouts of a person's cell phone within a "cone" of approximately less than a mile and a half from the cell phone tower with which a cell phone was in communication. The results of his analysis showed that near midnight, Hughes' cell phone was near defendant's home, and then both cell phones seemed to go in the direction of Westwego. The records further revealed that at approximately 12:18 a.m., defendant's cell phone was in use and near Sycamore Drive where Kevin was murdered. On cross-examination, Detective Zanotelli clarified that the report tracks the location of mobile devices, and thus, he could not verify whether either Hughes or defendant actually possessed their cell phones at the time the movements were tracked.
At trial, the State asked Johnneika whether defendant admitted to her that he *1129 had lured Kevin outside under the pretense he was going to conduct a drug deal and then murdered him. The State also questioned her about whether defendant admitted to her that it was a bad idea for him to contact Kevin from his phone, which is why he decided to change his number. At trial, Johnneika testified that she could not remember or did not know and denied that defendant admitted to her that he killed Kevin.
The State published to the jury copies of Johnneika's grand jury testimony during which she stated that sometime after midnight on October 19, 2015, Hughes and defendant arrived at her house in a gray truck and that defendant told her that he and Hughes had shot at Kevin. She further stated that she knew that defendant was "beefing" with Kevin over Kevin stealing a gun from defendant's aunt's car. She testified that she later texted defendant that Kevin was dead, and that defendant responded that he already knew Kevin was dead and instructed her to delete the text message.
Johnneika further testified that defendant told her that he had called Kevin from his phone on the night of the murder pretending to contact him to purchase marijuana. Defendant admitted to Johnneika that calling Kevin was a mistake, and that he changed his phone number the day after the murder. She also stated that Hughes told her to lie about defendant's whereabouts on the night of the murder.
The State also published to the jury a document from a confidential meeting with Johnneika on April 24, 2017, at her house. On the document, Johnneika wrote that her statements to the grand jury were the truth and that she had been treated fairly and appropriately by the district attorney's office. It also stated that she was afraid to tell the truth in court because she feared someone would hurt her or her family. The piece of paper was signed by Johnneika, the State, and her legal guardian, Arnetta.
At trial, Arnetta could not remember whether she saw defendant and Hughes outside of her house after midnight following the murder, and she was treated as a hostile witness by the State. Arnetta maintained that she only saw a gray truck outside of her house on that night. Arnetta identified photographs of the truck she saw outside of her house, which was confirmed to be Hughes' uncle's truck.[11]
The State also presented at trial the testimony of Lloyd Petit as other crimes evidence. He testified that on October 18, 2015, he reported that his firearm, a .9 mm Ruger, was missing from his home. He reported to the police that the last time he saw the gun was October 16, 2015, at approximately 7:00 p.m. in his bedroom where he hid it.
Mr. Petit recalled that on October 17th, he and his wife left their home at around 8:00 a.m. to go to work, and that he left his stepdaughter, Lamerika, and her younger sister at home. He noticed that when he arrived home that night around 10:00 p.m., his bed was made when it had not been made when he left for work that morning.
*1130 The following morning, his younger daughter told him that two males were inside the residence with Lamerika the prior day while he was at work. Mr. Petit spoke to Lamerika, who told her stepfather that a Joseph Sylvester, age fifteen, and a Charles Brown, age sixteen, came to the house that day. Mr. Petit searched the house and discovered that his gun was missing. Mr. Petit reported the gun stolen and provided the gun's serial number to police. The police subsequently determined that Mr. Petit's gun was one of the two firearms used in connection with Kevin's murder.
At trial, Lamerika testified that she gave false names to her stepfather and the police out of fear that she would be killed or hurt if she told the truth about who was at her house. She admitted that she was still afraid to testify, even two years after the murder, but felt like she was betrayed because she knew and cared for Kevin. At trial, Lamerika admitted that defendant and Hughes came over to her house on October 17, 2015, and that she believed that Hughes stole the gun. She explained that while defendant and Hughes were at the house, Lamerika and defendant stayed downstairs in the family room while Hughes and a friend of Lamerika's, Nadia Wilson, went upstairs.
DISCUSSION
On appeal, defendant contends that (1) the trial court erred in denying his motions for new trial and post-verdict judgment of aquittal, essentially challenging the sufficiency of the evidence presented against him at trial; (2) the trial court erred in granting the State's 404(B) motion to introduce evidence of his alleged involvement in the theft of Mr. Petit's stolen firearm; and (3) the admission of his cell phone records in this case pursuant to the State's subpoena duces tecum violates his constitutional right to privacy. We will address each assignment of error in turn.
In his first assignment of error, defendant argues that the trial court erred in denying his motions for new trial and post-verdict judgment of acquittal wherein he challenged the sufficiency of the evidence presented against him at trial.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Neal , 00-674 (La. 6/29/01), 796 So.2d 649, 657, cert. denied , 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. State v. Baham , 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, writ denied , 15-0740 (La. 3/24/16), 190 So.3d 1189.
Defendant was charged with second degree murder. Second degree murder is defined in La. R.S. 14:30.1 as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though *1131 he has no intent to kill or to inflict great bodily harm. State v. Lewis , 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied , 06-757 (La. 12/15/06), 944 So.2d 1277. Here, the written jury charges, signed by the trial judge, reflect that the jury was instructed that it could convict defendant under the theory that he had the specific intent to kill or inflict great bodily harm upon Kevin or because defendant was engaged in the commission or attempted commission of an armed robbery.
Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Nelson , 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500, writ denied , 15-0685 (La. 2/26/16), 187 So.3d 468. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.
On appeal, defendant does not challenge the essential statutory elements of the crime but, rather, he challenges the State's evidence presented to prove his identity as the perpetrator. Defendant contends that his cousin, Daniel Bryant, with whom he lived, should be considered the prime suspect in this case as he had access to both guns and defendant's cell phone as well as a motive for murdering Kevin. He contends it is just as likely that Hughes and Daniel were the shooters as Hughes had access to the .9 mm Ruger and Daniel to the unrecovered .9 mm. Defendant further contends that the cell site location information introduced at trial failed to prove that defendant had actual possession of his cell phone on the night of the murder and did not physically place defendant at the scene of the murder. Defendant also challenges the credibility of Johnneika due to her mental status and contradictory testimony and describes her as a "leaky vessel."
With respect to defendant's identification as the perpetrator, there were no eyewitnesses to the murder. Rather, Johnneika identified defendant as the perpetrator in her interview to police and in her grand jury testimony, not as an eyewitness to the murder, but because defendant confessed to her that he did it. Although defendant argues that Johnneika was a "leaky vessel" because she lied initially to the police and then maintained at trial that she could not remember what occurred, and that she was diagnosed as suicidal and with depression, the jury nonetheless considered these issues with regard to Johnneika's credibility. Further, the jury heard and considered Johnneika's contradictory trial testimony but also the fact that both she and Arnetta were afraid that if Johnneika told the truth someone would hurt them or their family.
Despite Johnneika's inconsistent statement at trial, the jury clearly believed her prior statements that defendant confessed to her that he lured Kevin outside by pretending to want to buy marijuana and then shot him in the back as he tried to run away. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Saulny , 16-734 (La. App. 5 Cir. 5/17/17), 220 So.3d 871, 876, writ denied , 17-1032 (La. 4/16/18), 240 So.3d 923 ; see also State v. Cowart , 01-1178 (La. App. 5 Cir. 3/26/02), 815 So.2d 275, writ denied , 02-1457 (La. 5/9/03), 843 So.2d 387.
Furthermore, Johnneika's identification of defendant was corroborated by direct evidence presented by the State that defendant's cell phone contacted Kevin's cell phone moments before the murder and then defendant changed his number the day following the murder. It was further *1132 supported by the cell phone records with cell site location information evidencing that defendant went to Hughes' house prior to the murder before they both went in the direction of Westwego, where the murder occurred, and further cell site location information placed defendant's cell phone in the area of the murder and showed his phone in use around the time it occurred. This was further corroborated by the testimony and evidence showing that defendant and Hughes were together in Hughes' uncle's gray truck on the night of the murder.
Although defendant argues that the State failed to prove that he retained physical possession of the cell phone, and asserts that Daniel Bryant could have been using the cell phone, the intimacy of the text messages between defendant and Johnneika after the murder, and the fact that Johnneika was still in communication with the new number after the murder, support the State's evidence that defendant had possession of his own cell phone and changed his number following the murder to conceal the fact that he had called Kevin. The text messages also appear to evidence defendant's guilty conscience as he indicated that he needed someone to talk to, his nervousness over communicating about the murder as he told Johnneika not to speak about the murder and to delete their text messages, and his regret over telling her he did it after the two had a romantic squabble. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt. State v. Bellow , 08-259 (La. App. 5 Cir. 7/29/08), 993 So.2d 307, 316, writ denied , 08-2109 (La. 4/13/09), 5 So.3d 162.
The State also presented evidence to show that Johnneika was instructed by Hughes to lie about defendant's whereabouts on the night of the murder and Kevin's cell phone extraction report showed text messages between Kevin, Hughes, and defendant indicating they had "beef," which supported the State's theory as to defendant's motive. Defendant contended that Daniel was the true murderer and argued to the jury that Daniel had access to defendant's phone because the two lived together, had a motive as it was his mother's weapon that was stolen, and that at one point he had actually possessed and used the unrecovered .9 mm weapon. Yet, the jury chose not to believe this theory.
Thus, viewing the evidence in the light most favorable to the prosecution under the Jackson standard, we find that the State proved defendant committed the second degree murder of Kevin Thomas, Jr. beyond a reasonable doubt, and the trial court did not abuse its discretion in denying the motions for new trial and post-verdict judgment of acquittal.
In his second assignment of error, defendant asserts that the trial court erred in granting the State's motion to introduce evidence that he was present when Mr. Petit's .9 mm Ruger was stolen from his home. On May 1, 2017, the State filed a "Notice of Intent to Introduce Evidence" that defendant was present at the time a firearm-which officers determined was used in connection with Kevin's murder-was stolen, and thus, had access to the weapon. The State averred that the evidence was admissible for purposes of proving defendant's intent, opportunity, preparation, plan, and identity. In opposition to the motion, defendant argued that the evidence was highly prejudicial against defendant in light of the fact that he did not steal the weapon, and the prejudicial effect would outweigh any probative value. At the hearing on the State's motion, defendant indicated that he had no objection to Mr. Petit testifying that his weapon was *1133 stolen from his home or with the investigating officer testifying as to the investigation surrounding the stolen weapon, but only that he had an "issue" with the State presenting evidence to show that defendant stole the weapon. At the hearing, the trial court granted the State's motion, finding evidence that defendant was at Mr. Petit's home the day the weapon was stolen was probative and relevant.
At trial, the State presented ballistic evidence showing that Mr. Petit's .9 mm Ruger was used at the scene of the murder, although none of the shots fired from the .9 mm Ruger hit Kevin. Lamerika and Mr. Petit's testimony clearly established that on October 17, 2015, two days prior to the murder, defendant and Hughes were at Mr. Petit's house where the gun was located.[12] At trial, Lamerika denied that defendant ever left her presence while he was in her home, while Hughes went upstairs, where the gun was kept, with her friend Nadia.
Upon our review of the record, we find that the other crimes evidence at issue was not of another crime or bad act committed by defendant, but rather that of a crime allegedly committed by Hughes. The evidence at issue revealed that defendant was with Hughes two days before the murder, allegedly resulting in Hughes' possession of one of the weapons used at the scene of the murder.
La. C.E. art. 404(B) provides that evidence that constitutes an integral part of the crime, formerly known as "res gestae," is admissible "...when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." State v. Scott, 15-1762 (La. 11/30/15), 184 So.3d 2, 7. A "close connexity" between the charged and uncharged conduct is required. In State v. Rhea , 03-1273 (La. App. 5 Cir. 2/23/04), 868 So.2d 863, 867, this Court recognized:
The test for integral act (res gestae) evidence is, therefore, not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive the State's case of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.
Id. (citing Colomb , 747 So.2d at 1076, quoting Old Chief v. United States , 519 U.S. 172, 187, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997) ).
Upon review of the record, we find that the evidence at issue was admissible as integral act evidence to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place." See Charles, supra . The State presented evidence to show a connection between Hughes' alleged taking of the weapon and the use of that stolen weapon in the murder only two days later. Lamerika testified that defendant and Hughes came to her house on October 17, 2015, and Mr. Petit testified that the police came to his house on October 18, 2015, when he reported the firearm stolen. Kevin was murdered in the early hours of October 19, 2015.
Also, the State acknowledged at trial that both weapons used at the murder scene were not recovered from the searches of defendant's or Hughes' home *1134 and were also involved in other subsequent and unrelated criminal acts. Further, the State did not attempt to prove that defendant stole Mr. Petit's gun. However, it was integral for the State to demonstrate how one of the weapons used at the scene of the murder was obtained close in time to the murder by Hughes, defendant's close associate who the State alleged acted with defendant to kill Kevin. Accordingly, we find that trial judge did not abuse his discretion in granting the State's motion and this assignment of error is without merit.
In his final assignment of error, defendant asserts that his Fourth Amendment right to privacy was violated when the State introduced his cell phone records, which included cell site location information, at trial. Defendant contends that the evidence, which was obtained pursuant to a subpoena duces tecum issued by the State under 18 U.S.C. § 2703, rather than with a warrant, was obtained in contravention of the recent United State Supreme Court's decision in Carpenter v. United States , --- U.S. ----, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018). In its appellee brief, the State responds that defendant failed to preserve this issue for review because a motion to suppress was never heard or ruled upon in this case and, further, because defendant failed to object to the introduction of the evidence at trial.
The record reflects that, on February 7, 2017, the State issued a "Motion for Issuance of Subpoena Duces Tecum pursuant to 18 U.S.C. § 2703," which the trial court granted, seeking all account information, cell site location information, and incoming and outgoing call information for the months of September and October, 2015, regarding cell phone number (504) 509-XXXX. Although the record reflects that defendant filed Omnibus Motions and Order for Pre-trial Motions, including a motion to suppress the evidence sought to be used against him, the omnibus motions were never heard. Generally, a defendant waives all pending motions by permitting trial to proceed without raising the issue that his pre-trial motions were neither heard nor ruled on. State v. Fletcher , 02-707 (La. App. 5 Cir. 12/30/02), 836 So.2d 557, 559, writ denied , 03-0409 (La. 10/10/03), 855 So.2d 334 ; see also La. C.Cr.P. art. 703(F). Furthermore, defense counsel did not object at trial to the introduction of the records containing the cell site location information. "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." La. C.Cr.P. art. 841(A). Therefore, defendant has not properly preserved this issue for review on appeal.
Nevertheless, even if considered, we find that exclusion of the evidence at issue would not be warranted in this case. On appeal, defendant relies on Carpenter v. United States , supra , in which the United States Supreme Court held that a warrant supported by probable cause is generally required before cell phone location records from a third-party provider can be acquired and that a showing under the Stored Communications Act fell "well short of the probable cause required for a warrant." Id. , 138 S.Ct. at 2221. Although Carpenter was decided subsequent to defendant's conviction and sentence, the United States Supreme Court has instructed that a new rule for the conduct of criminal prosecution is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final. Griffith v. Kentucky , 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). Therefore, the Carpenter holding applies retroactively to defendant's case as it is currently pending on direct review with this Court. Applying Carpenter to the facts of this case, it appears that the State did not comply with the Fourth Amendment in its reliance on an SCA court order to *1135 obtain defendant's cell site location information from a third-party provider.
However, exclusion of the evidence under such circumstances is not always appropriate. The exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates." United States v. Leon , 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In Davis v. United States , 564 U.S. 229, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), the United States Supreme Court held that evidence obtained during a search conducted in objectively reasonable reliance on binding appellate precedent, which is subsequently overruled, is not subject to the exclusionary rule.
Here, the State relied upon the Stored Communications Act § 2703 to obtain defendant's cell site location information. That part of the SCA authorizes courts to order cell-phone providers to disclose non-content information if the State "offers specific and articulable facts showing that there are reasonable grounds to believe that ... the records or other information sought are relevant and material to an ongoing criminal investigation." See 18 U.S.C. § 2703(c)(1)(B) and 2703(d). Attached to the State's subpoena duces tecum was the affidavit for defendant's arrest warrant, certifying that defendant had contacted Kevin via text message just minutes before the murder occurred from his cell phone in order to meet with Kevin under pretense of a drug transaction. The trial court granted the order, and the subpoena duces tecum was issued to T-Mobile after the trial court found that the State had "offered specific and articulable facts showing there are reasonable grounds to believe that the information requested [was] relevant and material."
Upon our review of the record, we find that the officers acted in accordance with the SCA and established Louisiana jurisprudence prior to Carpenter's holding. See State v. Isaac , 17-87 (La. App. 5 Cir. 10/25/17), 229 So.3d 1030. Accordingly, we find exclusion of the evidence would not have been warranted under the facts of this case. This assignment is without merit.
ERROR PATENT DISCUSSION
The record was reviewed for errors patent pursuant to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reflects that the trial judge failed to order that defendant's sentence of life imprisonment be served without the benefit of probation or suspension of sentence as mandated by La. R.S. 14:30.1. However, under La. R.S. 15:301.1, statutory restrictions on probation, parole, or suspension of sentence are self-activating. The Uniform Commitment Order (UCO) and the sentencing minute entry correctly reflect that defendant received a life sentence with parole eligibility, yet they fail to correctly reflect the restriction of the benefits of probation or suspension of sentence. Therefore, we remand this matter for the correction of the UCO and the sentencing minute entry for correction to reflect statutory restrictions on probation and suspension, and order the trial court to transmit the corrected versions to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B). See State v. Roland , 06-244 (La. 9/15/06), 937 So.2d 846 (per curiam); State v. Long , 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142.
DECREE
Accordingly, for the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED

Donald Hughes was also named as a co-defendant in the bill of indictment but was tried separately from defendant.

Defendant is a juvenile homicide offender and was sentenced in accordance with the United States Supreme Court's decision in Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

Ms. Jackson testified that Kevin's father found the cell phone in the grass outside of the apartment after the murder and brought it inside before police arrived.

The record also indicates that defendant's nickname was "Madge," and Hughes' nickname was "Dulla."

At the time the police executed a search warrant at Hughes' residence located at 2462 Oxford Place in Gretna, it was discovered that his uncle, who resided there, owned a silver 2014 GMC pickup truck which matched the description of the truck provided by Johnneika and Arnetta at the interview. Further, the automated license plate recognition database confirmed that the truck had been driven on the night of the murder.

At the end of the interview, Johnneika was taken away by ambulance to Northlake Behavior Health System where she was committed for one week. Johnneika was diagnosed as suicidal and with depression.

Detective Orlando explained a "lick" was a hit on someone or a theft.

Officers collected one firearm, a .9 mm Ruger, on December 29, 2015, as evidence in an unrelated case. The gun was ultimately recovered in possession of someone who was never a suspect in Kevin's murder. It was also used in three unrelated incidents occurring on October 29, 2015, November 30, 2015, and December 1, 2015.

The State presented the testimony of Tasha Harrison who provided that on October 10, 2015, she was sitting outside her house when Daniel, a/k/a Deezol, approached her and fired shots in the air. Tasha called out to Daniel that she knew it was him, and she also recognized his car. The police were called, and the shell casings were collected. Tasha also identified Daniel in court during trial as he was an inmate in Jefferson Parish and was brought in for her to identify him.

Susan Johnson, the custodian of the T-Mobile phone records for (504) 509-XXXX, identified call detail records with cell site location information and indicated such records were kept in the normal course and scope of business. She further explained that the cell phone records contained the date and time text messages or calls were made and received as well as the latitude and longitude of the cell phone tower through which the cell phone was routed.

Arnetta testified that she did not know what happened "seriously and it's jeopardizing my life and everything. I'm ready to get out of here. For real, I'm dyslexic and I have bad nerves. I'm serious. I'm diagnosed. I don't want to be in here, I don't. I don't know what happened that night. I'm ready to go." On cross-examination, defense counsel attempted to question Arnetta about a statement she made during the police interview wherein she said, "[i]f you live by a gun, you die by a gun." She responded "that's what's going on out there and that's why I'm up here right now scared for my life. They're killing grandchildren, killing kids and everything. They don't care about nobody out here. I'm ready to get from off the stand. You heard me? I'm ready for real."

Detective Zanotelli's testimony corroborated that his analysis of the cell site location information from that evening revealed that Hughes and defendant's cell phones were around the area of Lamerika's house. However, Detective Zanotelli clarified that this same area also included defendant's home, and it could not be ascertained where exactly within the area defendant was located.