******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DARIUS ARMADORE
## (SC 20248)

McDonald, D'Auria, Kahn, Ecker, Keller and Vertefeuille, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. The defendant and a friend, T, had driven to a café, where the victim was fatally shot, and subsequently drove to a nightclub about twelve miles away. Another individual, G, saw T and a man who matched the defendant's description enter the nightclub about fifteen to twenty minutes after G received a phone call informing him that the victim had been shot. The defendant claimed that he was at the nightclub at the time of the shooting. After oral argument before the Appellate Court but before that court released its decision in the present case, the United States Supreme Court decided *Carpenter* v. *United States* (138 S. Ct. 2206), in which the court held that the fourth amendment requires the government to obtain a warrant supported by probable cause before acquiring historical cell site location information (CSLI), which reveals a cell phone user's past physical movements. The Appellate Court thereafter summarily denied the defendant's motion for permission to file a supplemental brief to raise a new claim, premised on *Carpenter*, challenging the admission of certain CSLI records, which the police had obtained prior to the defendant's arrest. The CSLI records of the defendant's cell phone and the two cell phones T had with him on the night of the shooting were admitted into evidence at trial without objection. Relying on the CSLI records of T's phones, the state's expert testified that T's and the defendant's cell phones were located near the café at about the time of the shooting and near the nightclub shortly thereafter. The Appellate Court upheld the defendant's conviction, and the defendant, on the granting of certification, appealed to this court, claiming, inter alia, that the Appellate Court improperly had denied his motion for permission to file a supplemental brief. *Held*:

1. The defendant could not prevail on his claim that the Appellate Court improperly denied his motion for permission to file a supplemental brief after oral argument before that court so that he could raise an unpreserved claim premised on the new constitutional rule announced in *Carpenter*, as his claim failed under the fourth prong of *State* v. *Golding* (213 Conn. 233) because the Appellate Court's failure to permit the defendant to file a supplemental brief was harmless beyond a reasonable doubt: generally, an appellate court should grant a request for supplemental briefing when a party asks it to entertain an unpreserved claim premised on a newly announced constitutional rule in all but the clearest of situations in which the claim would fail under one of *Golding*'s four prongs, and principles of fairness and equity required the Appellate Court to exercise its discretion to grant the defendant's motion; nevertheless, the state sustained its burden of demonstrating that any claimed error was harmless, there having been significant evidence presented at trial that placed the defendant at the crime scene at the time of the shooting, including the historical CSLI records from T's two cell phones, which placed T at the café around the time of the shooting, T's testimony that he had the two cell phones throughout the night, admissions by both T and the defendant, to the police and at trial, that they were together that night, and testimony from other witnesses that they had seen a man fitting the defendant's description flee the scene of the shooting and enter a car that matched the appearance of the car T was driving, and there having been significant evidence linking the defendant to the victim's murder, including DNA and ballistics evidence, and the defendant's statement to his girlfriend that he had shot someone on the night of the victim's murder; moreover, there was no merit to the defendant's claim that this court could not consider the CSLI records of T's cell phones in determining the strength of the state's case, as the defendant lacked standing to challenge the admission of T's CSLI records on the ground that such admission violated T's fourth amendment rights.

2. The trial court properly admitted G's testimony about a phone call that

he had received from another individual informing him that the victim had been shot: the Appellate Court incorrectly determined that the defendant had not adequately preserved his claim that G's testimony constituted inadmissible hearsay because, although defense counsel objected when the prosecutor asked G what was said to G during the phone call without clarifying that the ground for the objection was hearsay, the state and the trial court were aware of the basis of the objection, and, thus, any failure by defense counsel to clarify the ground for the objection did not deprive the state and the trial court of fair notice of the defendant's claim; moreover, G's testimony was properly admitted as nonhearsay, as the caller's statements were not offered for their truth but, rather, to show their effect on G, specifically, that the phone call caused G to take certain actions that were relevant to establish the state's time line of events; furthermore, even if G's testimony about the call constituted inadmissible hearsay, its admission was harmless because, even if G had not been permitted to testify about what the caller told him, G's other testimony, to which defense counsel did not object, would have led a jury reasonably to infer that the victim had been shot prior to the defendant's and T's arrival at the nightclub, and because there was other evidence establishing the defendant's guilt, including the CSLI records of T's phones, which, coupled with the defendant's admission that he was with T on the night of the shooting, demonstrated that the defendant was near the café at the time of the shooting.

Argued October 20, 2020—officially released March 23, 2021*

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New London and tried to the jury before *A. Hadden, J.*; verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, which denied the defendant's motions for permission to file a late motion for rectification and to file a supplemental brief; subsequently, the Appellate Court, *Lavine*, *Sheldon* and *Harper, Js.*, affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Emily Graner Sexton*, assigned counsel, with whom were *Julia K. Conlin*, assigned counsel, and, on the brief, *Matthew C. Eagan*, assigned counsel, *James P. Sexton*, assigned counsel, *Megan L. Wade*, assigned counsel, and *John R. Weikart*, assigned counsel, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Paul J. Narducci*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this certified appeal, we are again required to examine the effect of the United States Supreme Court's recent decision in *Carpenter* v. *United States*, U.S. , 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), on a pending case. In *Carpenter*, the court held that, under the fourth amendment to the United States constitution, the government generally must obtain a warrant supported by probable cause before acquiring historical cell site location information (CSLI), which provides a comprehensive chronicle of a cell phone user's past physical movements.

The defendant, Darius Armadore, appeals from the Appellate Court's judgment affirming his conviction of murder, as either a principal or as an accessory, in violation of General Statutes §§ 53a-8 and 53a-54a (a). Specifically, he claims that the Appellate Court abused its discretion by denying him permission to file a supplemental brief to raise a new claim pursuant to *Carpenter*, which was released while his appeal was pending before that court. He argues that the rule in *Carpenter* applies retroactively to pending cases, and, thus, his failure to raise this claim before the trial court or in his initial brief to the Appellate Court did not bar review. Additionally, he claims that the Appellate Court incorrectly determined that his hearsay claim regarding the testimony of a key state's witness, Eduardo Guilbert, was unpreserved.

We agree with the defendant that our courts should liberally grant motions seeking to file supplemental briefs to raise claims premised on new constitutional rules announced during the pendency of a case and that the Appellate Court should have granted his motion in the present case. Nevertheless, we conclude that any error was harmless because the defendant's *Carpenter* claim fails under the fourth prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Additionally, although we agree with the defendant that the Appellate Court incorrectly determined that he did not preserve his hearsay claim regarding Guilbert's testimony, we agree with the state that the trial court properly admitted the testimony as nonhearsay because it was offered to show its effect on the hearer and that, alternatively, any error was harmless. Accordingly, we affirm the Appellate Court's judgment.

The following facts, which the jury reasonably could have found from the evidence admitted at trial, and procedural history are relevant to our review of the defendant's claims. In December, 2006, Gerjuan Rainer Tyus was involved in an ongoing dispute with the victim, Todd Thomas, regarding a necklace that the victim's brother had given to Tyus but wanted returned. Tyus refused to return the necklace unless the victim paid

him $10,000.

During the course of this dispute, on December 3, 2006, the victim, who was a passenger in a white Lexus registered to his wife, fired several gunshots with a .38 caliber firearm at Tyus, who was outside his apartment on Willetts Avenue in New London, striking him in the leg and the back. Tyus countered by firing five gunshots with a nine millimeter firearm at the victim. Five nine millimeter cartridge casings were recovered from the scene of the shooting. Later that day, Tyus was treated for his wounds at a hospital. The defendant, a close friend of Tyus, whom he considered to be a brother, later went to the hospital to receive news of Tyus' condition.[1] Although the defendant and Tyus were aware that the victim was the shooter, neither relayed this information to the police.

Following the Willetts Avenue shooting, on December 15, 2006, Tyus rented a silver-colored Chevrolet Impala. It was this vehicle that Tyus and the defendant used to travel to Boston, Massachusetts, at approximately 7 p.m. on December 22, 2006. While in Boston, the defendant and Tyus visited family and then picked up three women they wanted to bring back to Connecticut in the Impala. When one of the women refused to return with them, the defendant and Tyus returned to Connecticut with the other two women.

Later that evening, at approximately 11 p.m., the victim arrived at Ernie's Café on Bank Street in New London. Shortly after midnight, while the victim stood outside the front entrance of Ernie's Café smoking a cigarette, he was shot in the head. A light-skinned African American male wearing a hooded sweatshirt was observed fleeing the scene of the crime to a municipal parking lot, where he entered the passenger side of a silver-colored vehicle that had been waiting there with its motor running. The vehicle immediately sped away. The victim was transported to Lawrence + Memorial Hospital in New London, where he was pronounced dead upon arrival.

After the shooting, the defendant and Tyus arrived at Bella Notte, a nightclub in Norwich, approximately twelve and one-half miles from Ernie's Café. At trial, the defendant asserted an alibi defense, testifying that he and Tyus were at Bella Notte at the time the victim was shot. Tracking information contained in records produced by their cell service providers, which were admitted into evidence without objection at trial, established that their three cell phones—Tyus had two cell phones in his possession and the defendant had one— had activated cell towers near New London minutes prior to the shooting. One of Tyus' cell phones activated a cell tower in New London near Ernie's Café approximately eight times in the minutes before and after a 911 call was received reporting the shooting. Additionally, the cell phones activated cell towers north of New

London, toward Norwich, from approximately 12:42 to 12:44 a.m. and activated a cell tower farther north near Bella Notte from approximately 1:12 to 1:55 a.m. A few hours later, Tyus dropped the defendant off at the apartment the defendant shared with his then girlfriend, Ritchae Ebrahimi. At trial, Ebrahimi testified that, after the defendant arrived at the apartment, they argued over his having been with other women that night, and that he told her he had shot someone that night.

In addition to the historical CSLI, Tyus and a man matching the description of the defendant were seen entering Bella Notte by Guilbert while Guilbert was in the nightclub's bar area. Guilbert testified that the two men arrived after he received a phone call informing him that the victim had been shot. Guilbert was not sure of the precise time those events occurred, initially telling the police that it was at about 11 p.m., which would have been before the shooting occurred at Ernie's Café. See part II of this opinion.

Additionally, the police recovered one nine millimeter cartridge casing from the scene of the December 23, 2006 shooting. Ballistics evidence showed that this cartridge casing had been fired from the same firearm as the five nine millimeter cartridge casings that were recovered from the scene of the December 3, 2006 shooting on Willetts Avenue.

In November, 2012, the defendant and Tyus were arrested and charged with murder in violation of § 53a-54a.[2] The state thereafter filed long form informations charging the defendant and Tyus each with murder, both as a principal and as an accessory, in violation of §§ 53a-8 and 53a-54a (a). The state subsequently filed a motion to join the cases for trial, which the trial court granted over the objections of the defendant and Tyus. The defendant and Tyus were tried together before a single jury, which returned guilty verdicts as to both men without specifying whether the verdicts were based on principal or accessorial liability. The court sentenced the defendant to a term of sixty years of incarceration.

The defendant appealed from his conviction to this court, which transferred the appeal to the Appellate Court. See General Statutes § 51-199 (c); Practice Book § 65-1.[3] Before the Appellate Court, the defendant claimed that "(1) . . . the trial court abused its discretion in granting the state's motion to join his case with the case of his codefendant . . . Tyus; (2) . . . he was deprived of his constitutional right to confrontation when the state's firearms examiner was permitted to testify regarding the findings of another firearms examiner, who was deceased and thus unavailable to testify at trial; (3) . . . he was deprived of a fair trial when he was identified for the first time in court by Cindalee Torres without a prior nonsuggestive identification; and (4) . . . the court abused its discretion by admitting

certain hearsay statements into evidence." *State* v. *Armadore*, 186 Conn. App. 140, 142, 198 A.3d 586 (2018). After oral argument before the Appellate Court, the United States Supreme Court released its decision in *Carpenter.*

Approximately six weeks after the release of the *Carpenter* decision but prior to the Appellate Court's release of its decision in this case, the defendant moved in the Appellate Court for permission to file a supplemental brief to raise a new claim, premised on the new rule in *Carpenter*, challenging the admission of his historical CSLI, which was obtained through an ex parte order, along with the related testimony of James J. Wines, the state's expert in historical CSLI analysis. The defendant also moved for permission to file a motion for rectification with the trial court to have the ex parte order marked as a court exhibit because it was not introduced or admitted at trial. The Appellate Court summarily denied both motions.

The Appellate Court affirmed the trial court's judgment of conviction,[4] and the defendant sought certification to appeal to this court, which we granted, limited to the following issues: (1) "Did the Appellate Court properly deny the defendant's motion to file a late motion for rectification and the defendant's motion for permission to file a supplemental brief, which would have allowed the defendant to present an issue before the Appellate Court that the defendant claims is controlled by the retroactive application of [*Carpenter*]?" And (2) "Did the Appellate Court properly decline to review the defendant's evidentiary claim on the basis that it was not properly preserved?"[5] *State* v. *Armadore*, 330 Conn. 965, 200 A.3d 188 (2019). Prior to the parties' filing their briefs, this court sua sponte ordered them to address the merits of the defendant's *Carpenter* claim in addition to whether the Appellate Court properly denied the defendant's motion for permission to file a supplemental brief on the *Carpenter* issue. After oral argument before this court, we sua sponte ordered the parties to file additional supplemental briefs on the issue of whether this court could consider historical CSLI relating to Tyus' two cell phones in assessing harmless error under *Golding*'s fourth prong. We will present additional facts and procedural history as required.

I

The defendant first claims that the Appellate Court improperly denied his motion for permission to file a supplemental brief after oral argument in that court so that he could raise an unpreserved claim premised on the new constitutional rule announced in *Carpenter*. Specifically, he argues that, because the rule announced in *Carpenter* is a new constitutional rule, it applies to all pending cases, regardless of whether the claim was preserved at trial or included in his initial brief on appeal,

and, thus, the Appellate Court's failure to review the claim was "a per se abuse of discretion . . . ." The state responds that, although an unpreserved constitutional claim may be reviewed under *Golding*, the defendant still had to comply with the rules governing appellate procedure, regardless of the rules regarding retroactivity, and, thus, he abandoned his *Carpenter* claim when he failed to raise it in his initial brief in the Appellate Court. According to the state, the defendant could raise his abandoned *Carpenter* claim only if he could establish that the new constitutional rule in *Carpenter* overruled clearly established precedent, thereby rendering his procedural default excusable. The state contends that, because case law prior to *Carpenter* did not prohibit the defendant from seeking to suppress his historical CSLI under the fourth amendment, he cannot overcome his procedural default.

Before addressing this claim, we must review the pertinent facts and procedural history. Prior to the defendant's arrest, Detective Franklin S. Jarvis of the New London Police Department prepared ex parte orders pursuant to General Statutes § 54-47aa (b), which requires only "a reasonable and articulable suspicion that a crime has been or is being committed," to obtain historical CSLI associated with the defendant's cell phone and Tyus' two cell phones, from the day of the murder to the day after the murder. Detective Richard Curcuro of the New London Police Department subsequently received those records. The records were then sent to Wines, an agent with the Federal Bureau of Investigation's cellular analysis survey team, who analyzed the records and prepared a slideshow presentation detailing his analysis. Neither the defendant nor Tyus sought to suppress these records before trial, at which the CSLI, the slideshow, and Wines' expert testimony were admitted without objection.[6]

This evidence showed that all three cell phones activated cell towers in or near New London from between approximately 12:04 and 12:15 a.m., within minutes of when a 911 call was received at 12:09 a.m. reporting the shooting. Most importantly, one of Tyus' cell phones activated a cell tower in New London close to Ernie's Café eight times from approximately 12:04 to 12:14 a.m. Additionally, this evidence showed that the cell phones activated cell towers north of New London from approximately 12:42 to 12:44 a.m. and activated a cell tower farther north near Bella Notte between approximately 1:12 and 1:55 a.m.

The jury found the defendant guilty on November 19, 2015. The trial court sentenced him on January 15, 2016, after denying his postverdict motions for acquittal and for a new trial, but granted his request for a fee waiver and appointment of appellate counsel. The defendant appealed on September 2, 2016, filed his Appellate Court reply brief on March 7, 2018, and that court heard oral

argument on May 15, 2018.

The defendant did not raise a claim in his briefs to the Appellate Court challenging the admission of his historical CSLI. The United States Supreme Court released its decision in *Carpenter* on June 22, 2018, after oral argument in the Appellate Court in the present case. On August 3, 2018, the defendant moved for permission to file a supplemental brief in the Appellate Court to raise a new claim premised on the new constitutional rule in *Carpenter*. The Appellate Court summarily denied the motion on August 27, 2018, and, on November 13, 2018, released its decision, affirming the defendant's conviction.

In addressing this claim, it is necessary for us to clarify the standard governing our appellate courts' exercise of discretion under these circumstances. We determine that the policies underlying the requirement that new constitutional rules apply retroactively to pending cases weigh in favor of our courts' liberally permitting supplemental briefing to raise unpreserved claims premised on those new constitutional rules when they are announced during the pendency of a case. Thus, as a general rule, there is a presumption in favor of granting such motions. Only if it is clear that the claim would fail under one of the four prongs of *Golding*, thereby eliminating the need for briefing, should an appellate court deny a request for supplemental briefing under those circumstances. Nevertheless, in the present case, although we conclude that the Appellate Court abused its discretion by denying the defendant's motion for permission to file a supplemental brief, we determine that this error was harmless because the defendant's *Carpenter* claim fails under the fourth prong of *Golding*.

A

Our rules of practice do not specifically discuss motions for permission to file a supplemental brief. Pursuant to Practice Book § 60-2, however, an appellate court may, "on its own motion or upon motion of any party . . . (5) order that a party for good cause shown may file a late appeal, petition for certification, *brief or any other document* unless the court lacks jurisdiction to allow the late filing . . . ." (Emphasis added.) Additionally, Practice Book § 60-3 provides that, "[i]n the interest of expediting decision, or for other good cause shown, the court in which the appellate matter is pending may suspend the requirements or provisions of any of these rules on motion of a party or on its own motion and may order proceedings in accordance with its direction."

We previously have not articulated a standard of review for an appellate court's decision to grant or deny a motion for permission to file a supplemental brief. This gap in our law is hardly surprising. Although it

would be an overstatement to suggest that supplemental briefing is routinely granted or ordered in appellate cases, such briefs are filed with some regularity, both before and after oral argument and upon both the court's order or a party's motion. See, e.g., *State* v. *White*, 334 Conn. 742, 769 and n.14, 224 A.3d 855 (2020) (granting parties permission to file supplemental briefs to address effect of decision released after initial briefs filed); *State* v. *McCleese*, 333 Conn. 378, 411 n.15, 215 A.3d 1154 (2019) (granting defendant's request to file supplemental brief to address effect of decision released after defendant filed initial brief); *Petrucelli* v. *Meriden*, 198 Conn. App. 838, 846 n.7, 234 A.3d 981 (2020) (court sua sponte ordered supplemental briefing after oral argument); *Nonhuman Rights Project, Inc.* v. *R.W. Commerford & Sons, Inc.*, 197 Conn. App. 353, 359, 231 A.3d 1171 (granting petitioner's request for supplemental briefing), cert. denied, 335 Conn. 929, 235 A.3d 525 (2020). Despite this regularity, our research does not reveal any cases in which a party has challenged an appellate court's decision not to permit supplemental briefing.

We have recognized repeatedly that our rules of practice vest broad authority in the Appellate Court for the management of its docket. See, e.g., *Novak* v. *Levin*, 287 Conn. 71, 80, 951 A.2d 514 (2008). Additionally, this court has applied the abuse of discretion standard of review to the Appellate Court's rulings under Practice Book § 60-2. See id. (applying abuse of discretion standard in reviewing decision to grant late motion for reconsideration, which was included within scope of "any other document" under Practice Book (2006) § 60-2 (6) (now § 60-2 (5)); *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, 263 Conn. 204, 210, 820 A.2d 224 (2003) (Appellate Court has discretion to determine whether party has established good cause to file late appeal under Practice Book (2003) § 60-2 (6) (now § 60-2 (5)); *Ramos* v. *Commissioner of Correction*, 248 Conn. 52, 59, 61, 727 A.2d 213 (1999) (Appellate Court's decision to deny motion for permission to file late appeal under Practice Book (1999) § 60-2 (6) (now § 60-2 (5)) subject to abuse of discretion standard of review). A supplemental brief is similarly a document filed out of time, subject to the good cause standard, and, therefore, a ruling on its filing is appropriately reviewed for abuse of discretion.

To determine whether the Appellate Court appropriately exercised this discretion in the present case, we must first review the reason that court was asked to grant supplemental briefing—the United States Supreme Court's decision in *Carpenter*—along with our recent decision in *State* v. *Brown*, 331 Conn. 258, 261–62, 202 A.3d 1003 (2019), in which we applied *Carpenter*. "In *Carpenter*, the court considered whether the state conducts a search under the [f]ourth [a]mendment when it accesses historical cell phone records that provide a

comprehensive chronicle of the user's past movements. . . . The court answered that question in the affirmative and held that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI. . . . Accordingly, the state must generally obtain a warrant supported by probable cause before acquiring such records." (Citations omitted; internal quotation marks omitted.) Id., 272.

Prior to the release of the decision in *Carpenter*, the defendant in *Brown* was arrested and charged with numerous offenses, including burglary, after the police obtained his historical and prospective CSLI pursuant to multiple ex parte orders. Id., 262, 268–69. Prior to trial, the defendant filed motions to suppress the CSLI on the ground that the ex parte orders violated both § 54-47aa and his rights under the fourth amendment. Id., 269. Reaching only the statutory grounds for the motions, the trial court granted the defendant's motions, holding that the ex parte orders violated § 54-47aa and that suppression was the proper remedy. Id. "Following the granting of the defendant's motions to suppress, the state entered nolles prosequi on all of the charges against the defendant in the pending cases. In response, the defendant made an oral motion to dismiss all charges, which the trial court granted." Id., 270–71. The state then appealed to this court. "In their original briefs and arguments to this court, the parties focused primarily on whether the trial court properly granted the defendant's motions on the basis of its conclusion that the state obtained the prospective and historical CSLI in violation of § 54-47aa, and that suppression of the records was the appropriate remedy." Id., 263. "Following oral argument, however, this court stayed the appeal pending the decision of the United States Supreme Court in *Carpenter* and ordered the parties to submit supplemental briefs concerning the relevance of that decision to [the] appeal." Id.

After the decision in *Carpenter* was released, this court released its decision in *Brown*, in which we applied the new rule in *Carpenter* and concluded that the CSLI had been obtained illegally. Id., 271. Specifically, as to the ex parte order authorizing the disclosure of approximately three months of the defendant's historical CSLI,[7] we concluded that the order violated his fourth amendment rights because the records were obtained without a warrant. Id., 273. Next, we concluded that the trial court properly determined that suppression was the appropriate remedy. Id., 277.

Although, in *Brown*, this court applied the new rule from *Carpenter* retroactively to a pending case, we did not need to address any preservation issue because the defendant had moved to suppress the CSLI prior to trial. Additionally, we did not address the effect, if any, of a defendant's failure to raise a *Carpenter* claim in

his initial brief on appeal because the defendant in *Brown* had prevailed in the trial court on the statutory claim and argued in his initial brief, as an alternative ground for affirming the trial court's judgment, that the CSLI was obtained without a warrant in violation of the fourth amendment.

Yet, although the new constitutional rule in *Carpenter* was not discussed in detail in *Brown*, it is clear that we applied the rule retroactively to that pending case on appeal. In *Griffith* v. *Kentucky*, 479 U.S. 314, 322–23, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987), the United States Supreme Court had explained that, "at a minimum, all defendants whose cases [are] still pending on direct appeal at the time of [a law changing] decision should be entitled to invoke the new rule. . . . [F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication. First . . . after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review. . . . If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. . . . Second, selective application of new rules violates the principle of treating similarly situated defendants the same. . . . [T]he problem with not applying new rules to cases pending on direct review is the actual inequity that results when the [c]ourt chooses which of many similarly situated defendants should be the chance beneficiary of a new rule." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Id.

This court repeatedly has recognized and applied the *Griffith* rule regarding the retroactive application of new constitutional rules to pending cases. See, e.g., *State* v. *Dickson*, 322 Conn. 410, 449–51, 141 A.3d 810 (2016) (applying new rule regarding first time, in-court identifications to pending cases under *Griffith*), cert. denied,      U.S.      , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); *State* v. *Sanseverino*, 287 Conn. 608, 620 n.11, 949 A.2d 1156 (2008) (applying new rule in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), to pending cases), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008), and superseded in part after reconsideration, 291 Conn. 574, 969 A.2d 710 (2009); *State* v. *Coleman*, 38 Conn. App. 531, 536, 662 A.2d 150 ("[The] Supreme Court announced a new rule under our state constitution when it declared that the [balancing test enunciated in *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), which requires the weighing of the reasons for the unavailability of evidence against the degree of prejudice to the defendant caused by that unavailability] must be used in cases involving a claim of violation of

due process because of the loss or destruction of physical evidence. Because direct review is pending as to the defendant [under *Griffith*], it is mandated that the new rule be applied in this case."), cert. denied, 235 Conn. 906, 665 A.2d 903 (1995). In these cases, however, there was no discussion of how the retroactivity rule in *Griffith* interacted with preservation and procedural requirements, which were not at issue in these cases. Rather, in these cases, the court merely had to apply the new constitutional rule to a preexisting, properly raised claim.

Additionally, when a new constitutional rule has been announced after the parties have filed their briefs on appeal, consistent with the principles underlying the *Griffith* retroactivity rule, this court has granted parties' motions for permission to file a supplemental brief to analyze the new rule at issue. See *State* v. *Ryerson*, 201 Conn. 333, 337, 339, 514 A.2d 337 (1986). In fact, our Appellate Court has recognized that supplemental briefing is most common and appropriate in this circumstance: "Perhaps most frequently, supplemental briefing is ordered when a decision in another case or a change in law intervenes between the time of initial briefing and [an] appellate court's decision." *Gosselin* v. *Gosselin*, 110 Conn. App. 142, 153 n.4, 955 A.2d 60 (2008). In these cases, however, the litigant preserved the issue at trial and/or raised it in his initial brief on appeal; thus, the supplemental briefing on the new constitutional rule related back to a preexisting claim. See *State* v. *Ryerson*, supra, 337.

The application of the *Griffith* retroactivity rule is more complicated when the claim premised on the new rule is unpreserved. This court and the Appellate Court, both before and after *Griffith*, have allowed defendants to raise claims on appeal that were *unpreserved* at trial but were premised on a new constitutional rule that applied retroactively to the pending case.[8] Prior to 1989, we recognized as an exception to our preservation requirement "two situations that may constitute 'exceptional circumstances' such that newly raised claims can and will be considered by this court. The first is . . . where a new constitutional right not readily foreseeable has arisen between the time of trial and appeal. . . . The second 'exceptional circumstance' may arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." (Citation omitted.) *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973); see *State* v. *Vars*, 154 Conn. 255, 269–72, 224 A.2d 744 (1966) (holding that new constitutional claims need not be preserved at trial to be raised on appeal but not addressing whether such claims must be raised in initial brief on appeal).

In 1989, in *State* v. *Golding*, supra, 213 Conn. 239–40, "we reformulated the guidelines for appellate review

of unpreserved constitutional claims articulated in [*Evans*]," adopting the now familiar four part *Golding* standard. *State* v. *Ortiz*, 217 Conn. 648, 659, 588 A.2d 127 (1991). Under *Golding*, a party's failure to preserve a constitutional claim before the trial court does not prevent review as long as the record is adequate for review and the claim is not waived.[9] See *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) (waived constitutional claims are not reviewable under third prong of *Golding*). Nevertheless, the state argues that the defendant is not entitled to review of his unpreserved *Carpenter* claim unless it was unforeseeable at the time of trial.[10] The state's argument presumes that the first exceptional circumstance articulated in *Evans* remains the standard that is applicable when a defendant seeks to raise an unpreserved constitutional claim premised on a new constitutional rule. This is incorrect.

It is true that, in a footnote in *Golding*, this court explained that, only the second, not the first, exceptional circumstance stated in *Evans* was at issue in that case. See *State* v. *Golding*, supra, 213 Conn. 239 n.8. We did not indicate, however, that the new standard applied *only* to the second exceptional circumstance but, instead, stated that we were articulating "guidelines designed to facilitate a less burdensome, more uniform application of the present *Evans* standard in future cases involving alleged constitutional violations that are raised for the first time on appeal." Id., 239. We made the *Golding* standard applicable to *all* future cases involving alleged constitutional violations, not just to future cases raising constitutional violations pursuant to the second exceptional circumstance of *Evans*. Thus, the standard articulated in *Golding* fully replaced the exceptional circumstances standard articulated in *Evans*.

We recognize, however, that there has been apparent confusion over whether the *Golding* standard applies only to the second exceptional circumstance articulated in *Evans* and, thus, whether the *Evans* standard remains for unpreserved constitutional claims premised on new constitutional rules announced during the pendency of a case. See *State* v. *Shinn*, 47 Conn. App. 401, 408–409, 704 A.2d 816 (1997) (although defendant asserted that unpreserved claim, which was based on new rule announced while case was pending, was reviewable under both *Golding* and *Evans* standards, court reviewed claim under *Golding* without addressing *Evans*), cert. denied, 244 Conn. 913, 713 A.2d 832 (1998), and cert. denied, 244 Conn. 914, 713 A.2d 833 (1998); id., 419 (*Foti, J.*, dissenting) (stating that defendant argued that his claim satisfied first exceptional circumstance in *Evans*); see also *State* v. *Correa*, 185 Conn. App. 308, 322 and 322–23 n.10, 197 A.3d 393 (2018) (holding that unpreserved claim based on new rule announced in *State* v. *Kono*, 324 Conn. 80, 152 A.3d 1 (2016), was reviewable under first two prongs of *Golding* but failed

to satisfy third prong, and that claim would fail for same reasons under *Evans* exception for new constitutional rules that were not readily foreseeable), cert. granted, 330 Conn. 959, 199 A.3d 19 (2019); cf. *State* v. *Adams*, 139 Conn. App. 540, 545–46, 56 A.3d 747 (2012) ("there is no basis in our case law for the proposition that, following *Golding*, *Evans* provides an independent or distinct avenue for review for unpreserved claims of error"), cert. denied, 308 Conn. 928, 64 A.3d 121 (2013); *State* v. *Clark*, 48 Conn. App. 812, 827 n.13, 713 A.2d 834 ("[b]ecause *Golding* encompasses the exceptional circumstances of *Evans*, it is not necessary for us to review the defendant's claims under *Evans*"), cert. denied, 245 Conn. 921, 717 A.2d 238 (1998). To the extent that *Golding* leaves any doubt, we clarify that the *Golding* standard fully replaced the *Evans* standard. This is the only rational reading of *Golding* for three reasons.

First, as explained previously, the plain language of our opinion in *Golding* makes clear that this court intended to replace completely the *Evans* standard with a more uniform standard that would apply to *all* unpreserved claims of constitutional violations. Second, replacing the *Evans* standard with the *Golding* standard is in conformance with the policies underlying the retroactivity rule in *Griffith*. The *Griffith* rule would be rendered practically meaningless if it applied only when a claim premised on the new rule had been preserved at trial, a challenging—albeit not impossible—task when the new constitutional rule did not exist. Third, under the *Golding* standard, unpreserved constitutional claims premised on settled law—which are clearly foreseeable—are granted review as long as the record is adequate. It would be illogical to afford review to those claims, but not to unpreserved constitutional claims premised on new constitutional rules, regardless of whether the new rule was foreseeable.

This reading of *Golding* is consistent with this court's and the Appellate Court's application of *Golding* under these circumstances. Since *Golding*, when a new constitutional rule has been announced after a defendant's trial, but while his case remains pending, the Appellate Court has allowed the defendant to raise an unpreserved claim that was premised on the new rule. See *State* v. *Correa*, supra, 185 Conn. App. 322–23 and n.10 (holding that unpreserved claim based on new rule in *State* v. *Kono*, supra, 324 Conn. 80, was reviewable under first two prongs of *Golding* but failed under third prong); *State* v. *William L.*, 126 Conn. App. 472, 480, 11 A.3d 1132 ("new constitutional claims are reviewable under [*Golding*]"), cert. denied, 300 Conn. 926, 15 A.3d 628 (2011); *State* v. *Shinn*, supra, 47 Conn. App. 408–409 (unpreserved claim based on new rule announced while case was pending was reviewable under *Golding*).[11]

We note, however, that, in cases in which an appellate

court has reviewed under *Golding* an unpreserved claim premised on a new constitutional rule, the defendant raised the issue in the initial brief on appeal, which the defendant did not do here. See *State* v. *William L.*, supra, 126 Conn. App. 480; cf. *State* v. *Vars*, supra, 154 Conn. 269–72. The state concedes that, if the defendant had done so, he would have been entitled to review under *Golding*, as long as the record was adequate.

Less clear is how the rule in *Griffith* interacts with our rules of appellate procedure that deem a claim abandoned if it is not raised in a party's initial brief on appeal. See *State* v. *Elson*, 311 Conn. 726, 766, 91 A.3d 862 (2014) ("to receive review, a claim must be raised and briefed adequately in a party's principal brief, and . . . the failure to do so constitutes the abandonment of the claim"); *State* v. *Thompson*, 98 Conn. App. 245, 248, 907 A.2d 1257 ("[o]ur practice requires an appellant to raise claims of error in his original brief" (internal quotation marks omitted)), cert. denied, 280 Conn. 946, 912 A.2d 482 (2006). A claim otherwise reviewable under *Golding* may be abandoned if it is improperly briefed. Although, in *Evans*, this court stated that our procedural rules "must yield to the authority" of new constitutional rules if, "at the time of trial, [the claim] appeared to lack semblance of merit because it was clearly contrary to settled state law," thereby excusing any noncompliance with procedural rules; *State* v. *Evans*, supra, 165 Conn. 67–68; it is not clear whether an unpreserved claim premised on a new constitutional rule that arguably was foreseeable must satisfy our appellate procedural rules.

Although, generally, we are not bound to review claims that were not raised in a party's initial brief on appeal, "[w]e have never held . . . that we are precluded from doing so." *State* v. *Joyce*, 229 Conn. 10, 17, 639 A.2d 1007 (1994). Rather, appellate courts have discretion to consider a claim that was not raised in a party's initial brief, as long as "concerns regarding unfair surprise and inadequate argumentation can be alleviated by an order requiring the parties to file supplemental briefs." *State* v. *Elson*, supra, 311 Conn. 766. This is consistent with the discretion our appellate courts have to suspend appellate procedural rules for good cause and to permit supplemental briefing of a claim that was not raised in the initial brief on appeal. See Practice Book §§ 60-2 and 60-3. Thus, both this court and the Appellate Court have exercised this discretion to permit supplemental briefing of a claim that was not raised initially on appeal when that claim was premised on a new constitutional rule announced during the pendency of the appeal. See *State* v. *Hampton*, 293 Conn. 435, 457–58, 988 A.2d 167 (2009) (permitting defendant to file supplemental brief raising new claim in light of new constitutional rule announced in *Salamon*, which was released after defendant filed initial brief on appeal); *State* v. *Sanders*, 54 Conn. App. 732, 743,

738 A.2d 674 (permitting defendant to file supplemental brief raising unpreserved claim in light of new constitutional rule announced in *State* v. *Schiappa*, 248 Conn. 132, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), which was released after initial briefing in *Sanders*), cert. denied, 251 Conn. 913, 739 A.2d 1250 (1999)). Such an exercise of discretion is reasonable in light of the policies underlying *Griffith*'s retroactivity rule. Specifically, as explained previously, under *Griffith*, applying new constitutional rules to pending cases promotes both judicial integrity and equity. See *Griffith* v. *Kentucky*, supra, 479 U.S. 322–23. Not to do so may violate "basic norms of constitutional adjudication."[12] Id., 322. Because these policies require retroactive application of new constitutional rules, a newly announced constitutional rule provides good cause for a party to seek permission to file a supplemental brief raising a claim premised on that new constitutional rule.

Thus, in the present case, not only did the Appellate Court have discretion to grant the defendant's motion for permission to file a supplemental brief,[13] but principles of fairness weighed heavily in favor of granting the motion, as it was premised on a new constitutional rule announced during the pendency of the appeal. In such cases, it is difficult to imagine a situation in which supplemental briefing should not be granted.

Nevertheless, even in cases in which a court has allowed supplemental briefing to raise a claim that was based on a new constitutional rule, the defendant must establish that the unpreserved claim is entitled to review under *Golding*'s first two prongs and merits relief under *Golding*'s second two prongs. See *State* v. *Sanders*, supra, 54 Conn. App. 743 n.9, 743–44 (supplemental briefing was permitted for purpose of raising unpreserved claim premised on new constitutional rule, and claim was reviewable under *Golding*'s first two prongs but failed under *Golding*'s third prong); see also *State* v. *Davis*, 269 So. 3d 1123, 1134–35 (La. App.) (holding that, even if unpreserved claim premised on new constitutional rule in *Carpenter* was not waived and was reviewable, claim failed, as any error was harmless), cert. denied, 282 So. 3d 229 (La. 2019); *People* v. *Crum*, 184 App. Div. 3d 454, 455, 126 N.Y.S.3d 7 (holding that *Carpenter* claim was not preserved and was, thus, unreviewable but, alternatively, holding that, "regardless of the admissibility of the [CSLI], there was overwhelming evidence, including [the] defendant's confession, as well as videotapes that independently established his guilt"), appeal denied, 35 N.Y.3d 1065, 152 N.E.3d 1206, 129 N.Y.S.3d 404 (2020). As a result, even if supplemental briefing is granted, the defendant's claim ultimately may be unreviewable or fail on the merits.

Because a defendant raising an unpreserved constitu-

tional claim premised on a new constitutional rule must satisfy all four prongs of *Golding*, in limited circumstances, an appellate court may consider a defendant's clear inability to satisfy one of these prongs in determining whether it should exercise its discretion to permit supplemental briefing to raise this claim. See *State* v. *Watson*, 47 Conn. App. 771, 772, 706 A.2d 1368 (1998) (defendant denied permission to file supplemental brief to raise unpreserved claim premised on new federal interpretation of jury instruction language because, even if claim were allowed, it clearly would fail on merits, as it was settled law that state law controlled defendant's claim). We presume, however, that such cases are rare, as a determination of whether a claim satisfies the four prongs of *Golding* usually requires considerable reference to the record and relevant case law, thereby necessitating briefing.

Therefore, as a general rule, an appellate court ought to grant a request for supplemental briefing when a party asks it to entertain an unpreserved claim premised on a newly announced constitutional rule. The briefing should address both the merits of the new constitutional rule and whether it applies to the defendant, as well as whether the claim fails under one of the four prongs of *Golding*. We imagine that briefing would be appropriate in all but the clearest of situations in which the claim would fail under one of *Golding*'s four prongs. See id.

In the present case, because the Appellate Court summarily denied the defendant's motion for permission to file a supplemental brief, we do not know whether it exercised its discretion on the basis of its belief that the defendant's *Carpenter* claim clearly would fail under *Golding*. This case does not clearly fall within the limited category of cases in which the new rule clearly does not apply because it would fail under one of *Golding*'s four prongs. It is not the kind of case that does not require briefing to flesh out the record and unresolved legal issues in light of this new constitutional rule. This is made clear by the fact that this court had to request supplemental briefing regarding the fourth prong of *Golding* after oral argument. Additionally, there is the unresolved legal issue of whether *Carpenter* applies when the CSLI covers a period of less than seven days, which could apply to both the merits of the claim and the third prong of *Golding*. See *Carpenter* v. *United States*, supra, 138 S. Ct. 2217 n.3; id., 2224, 2233 (Kennedy, J., dissenting).

Thus, we conclude that principles of fairness and equity required the Appellate Court to exercise its discretion to grant the defendant's motion for permission to file a supplemental brief. Nevertheless, we conclude that the Appellate Court's erroneous denial of the defendant's motion was harmless, because, even if we assume, without deciding, that the defendant's *Carpen-*

*ter* claim is reviewable under the first two prongs of *Golding*, it fails under the fourth prong.

B

A defendant may prevail on an unpreserved claim under *Golding* when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Even if we assume that the defendant's *Carpenter* claim is reviewable under the first two prongs of *Golding* and that a constitutional violation exists that deprived him of a fair trial under the third prong, we nevertheless conclude that the state has sustained its burden of demonstrating that any claimed error was harmless beyond a reasonable doubt. "It is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis." *State* v. *Esarey*, 308 Conn. 819, 832, 67 A.3d 1001 (2013). Whether any error "is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008).

Both to determine whether the defendant's historical CSLI was cumulative and to evaluate the strength of the state's case, we must examine the other evidence admitted at trial. The defendant, however, argues that we cannot consider certain admitted evidence in undertaking this analysis, specifically, Tyus' historical CSLI, the admission of which, he claims, violated Tyus' fourth amendment rights. When codefendants are tried jointly,[14] the defendant contends, and there is harm to one code-

fendant, the court also may consider the effect of that harm on the other codefendant.[15]

1

The defendant's argument is premised on an alleged violation of Tyus' fourth amendment rights. A defendant must have a reasonable expectation of privacy in the property that was unlawfully searched to have standing to challenge the admission of evidence obtained during that search. See, e.g., *State* v. *Davis*, 283 Conn. 280, 323–24, 929 A.2d 278 (2007). Both this court and the United States Supreme Court repeatedly have explained that, "[t]he rights guaranteed by the fourth amendment are personal rights, and, therefore, only one whose own protection was infringed by a search and seizure may enforce those rights." (Internal quotation marks omitted.) *State* v. *Houghtaling*, 326 Conn. 330, 341, 163 A.3d 563 (2017), cert. denied, U.S. , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018); accord *Rawlings* v. *Kentucky*, 448 U.S. 98, 106, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980). Because a party must have a reasonable expectation of privacy in the property searched, a party generally lacks standing to challenge an illegal search of a third party's property. See, e.g., *State* v. *Houghtaling*, supra, 352 (defendant lacked reasonable expectation of privacy in property he owned but leased to third party); *State* v. *Iban C.*, 275 Conn. 624, 665, 881 A.2d 1005 (2005) ("a party is precluded from asserting the constitutional rights of another" (internal quotation marks omitted));[16] *State* v. *Castle*, 161 Conn. 570, 572, 287 A.2d 744 (1971) ("the defendant had no standing to object to the use of the evidence taken from his brother's room since the defendant had no possessory interest in either the room searched or the evidence seized and was not present when his brother's room was searched and the seizure [was] made"); see also *State* v. *Davis*, supra, 321 (rejecting automatic standing doctrine under state constitution, in part because defendant may not raise constitutional right of third party). "[S]uppression of the product of a [f]ourth [a]mendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." (Internal quotation marks omitted.) *United States* v. *Padilla*, 508 U.S. 77, 81–82, 113 S. Ct. 1936, 123 L. Ed. 2d 635 (1993).

Although neither this court nor our Appellate Court has had the opportunity to apply these principles in relation to the new rule in *Carpenter*, federal courts consistently have held that a defendant may not raise a *Carpenter* claim concerning the historical CSLI of a third party unless he can establish his own reasonable expectation of privacy in the cell phone. See *United States* v. *Beverly*, 943 F.3d 225, 238 (5th Cir. 2019) ("[The defendant] lacks standing to assert that the search of [the alleged coconspirator's] phone records was uncon-

stitutional. [The defendant] had no expectation of privacy in [the alleged coconspirator's] phone data, even if the search was unconstitutional as to [the alleged coconspirator]."), cert. denied,      U.S.    , 140 S. Ct. 2550, 206 L. Ed. 2d 485 (2020); *United States* v. *Brewer*, 708 Fed. Appx. 96, 99 (3d Cir. 2017) (holding that defendant lacked standing to suppress cell phone records obtained from phone that was in codefendant's possession and control), cert. denied,      U.S.    , 139 S. Ct. 1395, 203 L. Ed. 2d 625 (2019); see also *United States* v. *Dore*, 586 Fed. Appx. 42, 46 (2d Cir.) (in decision released prior to *Carpenter*, court held that defendant failed to establish legitimate expectation of privacy in cell phone and, thus, lacked standing to move to suppress CSLI records), cert. denied, 574 U.S. 1002, 135 S. Ct. 505, 190 L. Ed. 2d 380 (2014); cf. *United States* v. *Lauria*, Docket Nos. 19-CR-449-01 (NSR), 19-CR-449-02 (NSR) and 19-CR-449-03 (NSR), 2020 WL 5743523, *5 (S.D.N.Y. September 25, 2020) ("the defendant must establish ownership or another possessory interest in the phone at the time for which the data [are] searched"); *United States* v. *Serrano*, Docket No. 13 CR. 58 (KBF), 2014 WL 2696569, *7 (S.D.N.Y. June 10, 2014) ("The defendant has not proffered an affidavit that he has a privacy interest in that phone or the data on that phone. . . . Accordingly, the defendant's motion to preclude or suppress the cell site data is denied on the basis that the defendant has not established the requisite standing to bring the motion."). But see *United States* v. *Herron*, 2 F. Supp. 3d 391, 400–401 (E.D.N.Y. 2014) (defendant had legitimate expectation of privacy in cell phone registered to another individual but used exclusively by defendant and, thus, had standing to move to suppress historical CSLI obtained from that phone), aff'd, 762 Fed. Appx. 25 (2d Cir. 2019), petition for cert. filed (U.S. November 17, 2020) (No. 20-6428).

These courts have extended this rule to cases in which the defendant challenged the search of property belonging to a codefendant, even when the codefendants were tried jointly, explaining that "[coconspirators] and codefendants have been accorded no special standing." (Internal quotation marks omitted.) *United States* v. *Padilla*, supra, 508 U.S. 82; see *United States* v. *Turner*, 781 F.3d 374, 382 (8th Cir. 2015) ("[The defendant] has failed to establish that he has standing to challenge the issuance of the warrants for [precise location information] for phones belonging to [two coconspirators]. [He] does not assert that he owned, possessed, or used either of these cell phones; nor does he describe any other legitimate expectation of privacy in these phones or in the [precise location information] obtained from them."), cert. denied, 577 U.S. 889, 136 S. Ct. 208, 193 L. Ed. 2d 160 (2015), and cert. denied, 577 U.S. 912, 136 S. Ct. 280, 193 L. Ed. 2d 204 (2015), and cert. denied, 577 U.S. 980, 136 S. Ct. 493, 193 L. Ed.

2d 359 (2015); *United States* v. *Forest*, 355 F.3d 942, 948 (6th Cir.) (defendant lacked standing to challenge admission of codefendant's CSLI, even though defendant was in vehicle with codefendant during time period reflected in CSLI), vacated and remanded sub nom. *Garner* v. *United States*, 543 U.S. 1100, 125 S. Ct. 1050, 160 L. Ed. 2d 1001 (2005); *United States* v. *Anthony*, 354 F. Supp. 3d 607, 619–20 (E.D. Pa. 2018) ("[d]efendant . . . has not demonstrated that he had the reasonable expectation of privacy in the CSLI data of [codefendants]"), appeal filed (3d Cir. December 28, 2018) (No. 18-3812); *DeMartino* v. *United States*, Docket No. 07 CV 1412 (NG), 2010 WL 3023896, *9 (E.D.N.Y. August 2, 2010) (defendant had no expectation of privacy and thus no standing to challenge admission of information from codefendant's cell phone, despite having been tried jointly with codefendant); *United States* v. *Grissom*, 760 Fed. Appx. 448, 454 (7th Cir. 2019) (defendant did not have legitimate expectation of privacy in codefendant's CSLI); *United States* v. *Wilford*, 689 Fed. Appx. 727, 730 (4th Cir. 2017) (defendant lacked standing to challenge use of cell site stimulator to show location of coconspirator's cell phone), cert. denied, U.S. , 138 S. Ct. 2707, 201 L. Ed. 2d 1100 (2018);[17] see also *United States* v. *Capra*, 501 F.2d 267, 281 (2d Cir. 1974) (applying rule that "[c]oconspirators and codefendants have been accorded no special standing to enforce the exclusionary rule" when codefendants sought to suppress records of wiretapped calls on which only other codefendants were participants), cert. denied, 420 U.S. 990, 95 S. Ct. 1424, 43 L. Ed. 2d 670 (1975).

Although our Appellate Court has not yet addressed whether a defendant may challenge a *Carpenter* violation relating to a codefendant, it has ruled consistent with this federal precedent on similar issues. See *State* v. *Bethea*, 187 Conn. App. 263, 277, 202 A.3d 429 (even if defendant's unpreserved challenge to warrant for search of girlfriend's cell phone were reviewed, claim would fail because defendant lacked standing to move to suppress girlfriend's cell phone records), cert. denied, 332 Conn. 904, 208 A.3d 1239 (2019); *State* v. *Stanley*, 161 Conn. App. 10, 29, 125 A.3d 1078 (2015) (defendant lacked standing to suppress victim's cell phone records), cert. denied, 320 Conn. 918, 131 A.3d 1154 (2016). In the present case, consistent with these lines of cases, we conclude that the defendant lacked standing to challenge the admission of Tyus' historical CSLI and, thus, cannot successfully argue that we cannot consider the evidence these records yielded when considering the strength of the state's case for purposes of our harmless error analysis under *Golding*'s fourth prong.

Nevertheless, the defendant contends that prior case law supports his contention that, in determining harm, this court must not consider the evidence from the

illegally obtained records of Tyus' historical CSLI. Specifically, he argues that he does not need to establish standing to challenge the admission of Tyus' historical CSLI "because, [when] there is harm to one codefendant, federal jurisdictions, including the United States Supreme Court, have considered the harm of that error on the other codefendant." In support of his argument, the defendant cites cases stemming from the United States Supreme Court's holding in *McDonald* v. *United States*, 335 U.S. 451, 456, 69 S. Ct. 191, 93 L. Ed. 153 (1948). We find these cases to be not only distinguishable, but of questionable validity.

In *McDonald*, the petitioners, Earl McDonald and Joseph Washington, were tried jointly on charges of carrying on a lottery known as "the numbers game . . . ." Id., 452. Before trial, McDonald moved to suppress unlawfully seized evidence that included adding machines found during a warrantless search of his room inside a rooming house.[18] Id., 452–53. McDonald also sought the return of the adding machines. Id., 456. The trial court denied McDonald's motion, and, after both petitioners were convicted, they appealed, challenging the denial of the motion to suppress. Id. In a five to three decision, the United States Supreme Court held that "McDonald's motion for suppression of the evidence and the return of the property to him should have been granted." Id. As to Washington, the opinion announcing the judgment noted that "the unlawfully seized evidence was used not only against McDonald but against Washington as well, the two being tried jointly. Apart from this evidence, there seems to have been little or none against Washington. Even though we assume, without deciding, that Washington, who was a guest of McDonald, had no right of privacy that was [invaded] when the officers searched McDonald's room without a warrant, we think that the denial of McDonald's motion was error that was prejudicial to Washington as well . . . [because] the unlawfully seized materials were the basis of evidence used against [Washington, and] [i]f the property had been returned to McDonald, it would not have been available for use at the trial." (Citations omitted.) Id. Two justices, however, did not agree that the court had to address whether the denial of McDonald's motion to suppress was harmful to Washington. Rather, they reasoned that Washington also had a privacy interest in the property searched because he was a guest in McDonald's room in the rooming house at the time of the search. See id., 461 (Jackson, J., concurring).

Although some courts since *McDonald* have held that its holding meant that a defendant may challenge the admission of evidence illegally obtained from a codefendant when tried jointly; see, e.g., *Rosencranz* v. *United States*, 334 F.2d 738, 740 (1st Cir. 1964); the United States Court of Appeals for the Second Circuit has limited *McDonald*'s holding to its unique facts. Specifically,

in *United States* v. *Lee Wan Nam*, 274 F.2d 863 (2d Cir.), cert. denied, 363 U.S. 803, 80 S. Ct. 1236, 4 L. Ed. 2d 1147 (1960), the defendant sought to suppress heroin seized in violation of his codefendant's fourth amendment rights, arguing that *McDonald*'s holding trumped any standing requirement. Id., 865–66. The court in that case disagreed, holding that the defendant lacked standing to object to the admission of the heroin because he had no possessory interest in it. Id. The court distinguished the case before it from *McDonald* because the codefendant never moved to suppress the heroin, as McDonald had, and because the holding in *McDonald* "hinged upon the fact that the trial court committed error in failing to return the evidence to McDonald." Id., 866. Thus, the Second Circuit ruled that *McDonald* applied only if there was a timely motion to suppress by a party with standing and if the evidence at issue would not have been available for the government to use against all codefendants had the court granted the motion to suppress and returned the evidence. See id.; see also *United States* v. *Serrano*, 317 F.2d 356, 356–57 (2d Cir. 1963) (because neither defendant made timely motion to suppress or had standing to do so, narcotics evidence seized from codefendant, who later was severed from case, was properly admitted). As in *Lee Wan Nam*, in the present case, Tyus, the only person with standing, made no timely motion to suppress, and, thus, the present case is distinguishable from *McDonald*.

Moreover, in *Alderman* v. *United States*, 394 U.S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969), a case the defendant did not cite to us, the United States Supreme Court explicitly questioned the validity of the holding in *McDonald*. See id., 173 n.7. In *Alderman*, the petitioners, William Israel Alderman and Felix Antonio Alderisio, were tried jointly and convicted of conspiring to transmit murderous threats in interstate commerce. Id., 167. The record included evidence collected by illegal electronic surveillance of Alderisio's place of business. Id., 167–68. On appeal, "each petitioner demand[ed] retrial if any of the evidence used to convict him was the product of unauthorized surveillance, regardless of whose [f]ourth [a]mendment rights the surveillance violated. At the very least, it is urged that if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his codefendant or coconspirator." Id., 171. The court, however, explained that evidence may be inadmissible against one defendant but not against another, even if they were tried jointly. Id., 172–74. The court explained that, to challenge the legality of a search, the defendant must establish that "he himself was the victim of an invasion of privacy." (Internal quotation marks omitted.) Id., 173. "Fourth [a]mendment rights are personal rights which . . . may not be vicariously asserted. . . . There is no necessity to exclude evidence against one defendant in

order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party." (Citations omitted.) Id., 174.

The court in *Alderman* went on to explain that *McDonald* "is not authority to the contrary. It is not at all clear that the *McDonald* opinion would automatically extend standing to a codefendant. Two of the five [j]ustices joining the majority opinion did not read the opinion to do so and found the basis for the codefendant's standing to be the fact that he was a guest on the premises searched." Id., 173 n.7.

Although *Alderman* did not explicitly overrule *McDonald*, multiple courts since *Alderman* have treated *Alderman* as controlling, and the few courts that continue to apply *McDonald* have limited its scope to its unique facts. See, e.g., *United States* v. *Palazzo*, 488 F.2d 942, 947 (5th Cir. 1974); *Bretti* v. *Wainwright*, 439 F.2d 1042, 1047 (5th Cir.), cert. denied, 404 U.S. 943, 92 S. Ct. 293, 30 L. Ed. 2d 257 (1971); *United States* v. *Parrott*, 434 F.2d 294, 296 (10th Cir. 1970), cert. denied, 401 U.S. 979, 91 S. Ct. 1211, 28 L. Ed. 2d 330 (1971); *United States* v. *Nasse*, 432 F.2d 1293, 1302–1303 (7th Cir. 1970), cert. denied, 401 U.S. 938, 91 S. Ct. 928, 28 L. Ed. 2d 217 (1971), and cert. denied sub nom. *Tocco* v. *United States*, 401 U.S. 938, 91 S. Ct. 927, 28 L. Ed. 2d 217 (1971), and cert. denied sub nom. *David* v. *United States*, 402 U.S. 983, 91 S. Ct. 1657, 29 L. Ed. 2d 148 (1971); *United States* v. *James*, 432 F.2d 303, 306 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S. Ct. 2214, 29 L. Ed. 2d 682 (1971); *State* v. *Wallen*, Docket No. 9-09-22, 2010 WL 529864, *4 (Ohio App. February 16, 2010), appeal denied, 125 Ohio St. 3d 1463, 928 N.E.2d 738 (2010); see also *United States* v. *Tortorello*, 533 F.2d 809, 814 n.5 (2d Cir.) ("the Supreme Court has rejected a reading of *McDonald* which would automatically extend standing to a [codefendant]"), cert. denied, 429 U.S. 894, 97 S. Ct. 254, 50 L. Ed. 2d 177 (1976); *United States* v. *Graham*, 391 F.2d 439, 445 (6th Cir. 1968) (*McDonald* applies only if defendant with standing made timely motion to suppress that was improperly denied), cert. denied, 393 U.S. 941, 89 S. Ct. 307, 21 L. Ed. 2d 278 (1968), and cert. denied sub nom. *Tucker* v. *United States*, 390 U.S. 1035, 88 S. Ct. 1433, 20 L. Ed. 2d 294 (1968). Thus, under *Alderman*, the defendant cannot challenge the admission of Tyus' historical CSLI, and, to the extent that *McDonald* remains good law, it is distinguishable and, thus, inapplicable to the present case. Accordingly, we may consider Tyus' historical CSLI in determining harm.

## 2

We now turn to the evidence presented at trial and conclude that the Appellate Court's failure to permit the defendant to file a supplemental brief was harmless beyond a reasonable doubt. There was significant evi-

dence admitted at trial that placed the defendant at the crime scene at the time of the shooting. The historical CSLI from Tyus' two cell phones was admitted into evidence and relied on by Wines, who testified that these cell phones were located near Ernie's Café in New London at approximately the time of the shooting and then were located near Bella Notte in Norwich at approximately 12:45 a.m. Tyus admitted at trial that he had these cell phones with him throughout the night of the shooting. Additionally, both the defendant and Tyus admitted, to the police and at trial, that they were together on the night the victim was shot and killed.

There was other evidence as well from which the jury reasonably could have inferred that Tyus and the defendant arrived at Bella Notte after the shooting, thereby contradicting the defendant's alibi. Specifically, Guilbert testified that he saw Tyus and a man matching the defendant's description—a thinner, taller, lighter-skinned, African American male—enter Bella Notte together approximately fifteen to twenty minutes after Guilbert received a phone call informing him that the victim had been shot. See part II of this opinion. Thus, the records of the defendant's historical CSLI were cumulative of this other evidence showing that the defendant was near Ernie's Café at approximately midnight.

Moreover, there was significant other evidence of the defendant's guilt, either as a principal or as an accessory. There was evidence that the defendant and Tyus went to Boston on the night of the shooting in a silver-colored Impala that Tyus previously had rented. Multiple witnesses testified that, immediately after the shooting, a man fitting the defendant's general description—a light-skinned, African American man wearing a hooded sweatshirt—ran from the scene of the shooting and entered the passenger side of a silver-colored vehicle matching the appearance of Tyus' rented Impala. The defendant's DNA was retrieved from the Impala's passenger side. As to motive, there was evidence that the victim shot Tyus three weeks prior to the victim's death, that both the defendant and Tyus were aware that the victim had been the shooter, and that the defendant was upset over this attack on his friend, whom he considered a brother. Further, the firearms evidence the state presented showed that the gun that Tyus used to fire back at the victim on December 3, 2006, was the same weapon used to shoot and kill the victim three weeks later. And perhaps most damaging to the defendant was Ebrahimi's testimony that, hours after the shooting, he confessed to her that he had shot someone that night.[19] See *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 323 n.70, 112 A.3d 1 (2015) ("[t]his court has long recognized that confessions represent the most damaging evidence of guilt" (internal quotation marks omitted)).

Because the admission of the defendant's historical CSLI was cumulative of other evidence establishing that the defendant was near Ernie's Café at the time of the shooting, and because the state presented other significant evidence of guilt, we conclude that the admission of these records was harmless beyond a reasonable doubt. Therefore, the defendant's unpreserved *Carpenter* claim fails under the fourth prong of *Golding*, thereby rendering harmless the Appellate Court's improper denial of the defendant's motion for permission to file a supplemental brief.

## II

We next address whether the Appellate Court correctly determined that the defendant did not adequately preserve his hearsay objection to Guilbert's testimony about having received a phone call from Charlene Thomas informing him that the victim had been shot. He argues that both the state and the trial court understood his general objection to be based on hearsay and treated it as such. Additionally, he argues that, if the Appellate Court had reviewed his claim, it would have determined that the trial court improperly admitted the contested statement as nonhearsay and that this error was harmful. The state agrees that the defendant adequately preserved his hearsay objection but contends that the trial court properly admitted the statement to show the effect on Guilbert's subsequent actions, which were relevant because they established the time line as to when the defendant and Tyus arrived at Bella Notte. The state also argues that, to the extent there was error, it was harmless. We agree with the state that the trial court properly admitted the statement to show its effect on the hearer and that, regardless, any error was harmless.

## A

The following additional facts and procedural history are relevant to our review of whether the defendant's hearsay objection to the statement at issue sufficed to preserve this issue. At trial, Guilbert testified that he was at Bella Notte on the night when the victim was shot and that, while there, he received a phone call from Charlene Thomas, who has no relation to the victim. The prosecutor then asked: "And what was relayed to you on that phone call?" Both the defendant's counsel and Tyus' counsel objected, stating only, "[o]bjection." The prosecutor immediately responded: "Your Honor, I'm going to claim it on the effect of the hear[er]—and will explain what . . . Guilbert then did." Without hearing further argument, the trial court ruled: "All right. Given that claim, I'm going to overrule the objections and allow the testimony."

Once the court overruled the objections, Guilbert testified as follows: Charlene Thomas told him that the victim had been shot and that he should call the victim's

wife to let her know. After talking with Charlene Thomas, he called the victim's wife and told her that she should go to the hospital. No objection was made to Guilbert's testifying as to what he told the victim's wife. Guilbert then testified that, after talking with the victim's wife, he remained sitting at the bar at Bella Notte for approximately fifteen to twenty minutes when he saw Tyus and a taller, lighter-skinned, African American man come in from the front entrance. Guilbert had not seen them in Bella Notte prior to that moment. Tyus approached Guilbert, greeted him, and offered to buy him a drink. Guilbert responded that he was getting ready to leave and did not want a drink. Guilbert then left Bella Notte and went to the hospital to see the victim.

"[T]o preserve an evidentiary ruling for review, trial counsel must object properly by articulat[ing] the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose . . . . [T]he determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 317 n.1, 253 A.3d 458 (2020). Appellate review of the record may show that opposing counsel's response to the objection clarified whether counsel and the trial court understood the basis of the objection. See id. A party may " 'functionally preserve' " a claim even if the objection at trial did not incorporate the precise wording of the claim on appeal. Id.; see also *State* v. *Santana*, 313 Conn. 461, 467, 97 A.3d 963 (2014) ("this court has expressed a willingness to review claims that a party did not explicitly raise to the trial court if it is clear from the record that the substance of the claim was raised"). A hearsay objection is adequately preserved as long as the parties and the court had " 'fair notice' " that a hearsay objection was being raised. *State* v. *Benedict*, 313 Conn. 494, 505–506, 98 A.3d 42 (2014).

In the present case, although defense counsel merely stated, "[o]bjection," without clarifying that the ground for it was that Guilbert's testimony was hearsay, the prosecutor's response that he "claim[ed] it on the effect of the hear[er]," a recognized exclusion from the rule against hearsay; see part II B of this opinion; shows that the state was aware that the objection was premised on hearsay. Similarly, the fact that the trial court then ruled that, "[g]iven that claim [by the state], I'm going to overrule the objections," shows that the court, too, was aware of the basis for the objection. Considering that both the state and the trial court were aware of the basis of the defendant's objection, any failure to clarify the basis of the objection did not deprive the state or the trial court of fair notice of his claim. Thus,

we conclude that the defendant functionally preserved his hearsay claim.

B

Next, we turn to the merits of the defendant's claim that Guilbert's testimony regarding what Charlene Thomas told him over the phone was impermissible hearsay. The defendant argues that the statement was hearsay because it was relevant only if it was true—specifically, whether the defendant and Tyus entered Bella Notte after the phone call was relevant only if the victim already had been shot; otherwise, the phone call did not relate to the timing of the shooting or to the defendant's alibi, which was that he was already at Bella Notte at the time of the shooting. The state responds that it did not offer Guilbert's testimony to establish its truth—that the victim had been shot, which already had been established by other evidence admitted at trial—but to show its effect on Guilbert—namely, that this phone call caused him to take certain actions, which were relevant to establish the state's time line of events. We agree with the state.

"To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citation omitted; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 571–72, 46 A.3d 126 (2012).

"Hearsay means a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted. Conn. Code Evid. § 8-1 (3). The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay. . . . This exclusion from hearsay includes utterances admitted to show their effect on the hearer." (Citation omitted; internal quotation marks omitted.) *State* v. *Miguel C.*, supra, 305 Conn. 572.

Although "[s]tatements admitted to show the effect on the hearer are not hearsay . . . they should not be admitted for that purpose unless it is clear that the hearer's state of mind or subsequent conduct is rele-

vant." (Internal quotation marks omitted.) *O'Shea* v. *Mignone,* 35 Conn. App. 828, 833–34, 647 A.2d 37 (although statement was offered to show effect on hearer—police officer—it was not relevant, as officer's subsequent actions were not at issue and did not tend to show whether defendant was operating vehicle that struck plaintiff), cert. denied, 231 Conn. 938, 651 A.2d 263 (1994). "Because . . . the effect on the hearer rationale may be misapplied to admit facts that are not relevant to the issues at trial; C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 8.8.2, pp. 472–73; courts have an obligation to ensure that a party's purported nonhearsay purpose is indeed a legitimate one."[20] *State* v. *Miguel C.,* supra, 305 Conn. 574. To be relevant, evidence must "[tend] to establish a fact in issue or . . . corroborate other direct evidence in the case. . . . Accordingly, an out-of-court statement is admissible to prove the effect on the hearer only when it is relevant for the specific, permissible purpose for which it is offered." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id. "The proffering party bears the burden of establishing the relevance of the offered testimony." (Internal quotation marks omitted.) *Farrell* v. *Johnson & Johnson,* 335 Conn. 398, 408, 238 A.3d 698 (2020). Nevertheless, "[t]he trial court has broad discretion on questions of relevance." *State* v. *Watson,* 26 Conn. App. 151, 156, 599 A.2d 385 (1991), cert. denied, 221 Conn. 907, 600 A.2d 1362 (1992).

The crux of the defendant's hearsay claim is that Guilbert's testimony was relevant only if Charlene Thomas' statement was true. We disagree. Charlene Thomas' statement to Guilbert that the victim had been shot was not offered to establish that the victim had been shot—a fact that was not disputed and that the state had established through other evidence. Rather, the purpose of Guilbert's testimony was to show how Charlene Thomas' statement to him affected his subsequent actions, i.e., that he called the victim's wife and then decided to leave Bella Notte to go to the hospital to check on the victim. From Guilbert's testimony that the defendant and Tyus arrived at Bella Notte after the two phone calls and that Guilbert thereafter decided to go to the hospital to visit the victim, the jury reasonably could have inferred that the defendant and Tyus arrived at Bella Notte after the victim had been shot. This, in turn, tended to corroborate other direct evidence admitted at trial, such as the defendant's testimony that he was with Tyus that night and Tyus' historical CSLI showing that he did not arrive at Bella Notte until after the shooting. Thus, Guilbert's testimony was relevant both to establish when the defendant and Tyus arrived at Bella Notte, which was central both to the state's case and to the defendant's alibi, and to show the effect on the hearer's subsequent actions, which also were relevant. Accordingly, this evidence was properly admitted

as nonhearsay.

## C

Finally, even if we assume that Guilbert's statement that Charlene Thomas told him that the victim had been shot was hearsay, we agree with the state that its admission was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Bouknight*, 323 Conn. 620, 626–27, 149 A.3d 975 (2016). In determining the harm of an erroneous evidentiary ruling, we examine the same factors as we do in determining the harm of an erroneous constitutional ruling. Id.

The defendant argues that, without Guilbert's testimony about what he was told by Charlene Thomas, the state had no means to establish its proposed time line of events and to contradict his alibi because the jury would have heard only Guilbert's testimony that he saw Tyus and a man matching the defendant's description arrive at Bella Notte at about 11 p.m. Thus, Guilbert's testimony would have supported the defendant's alibi, rather than contradicting it, and would thereby establish that it is more probable than not that the contested statement affected the verdict. We disagree.

We first note that, even if Guilbert had not been allowed to testify as to what Charlene Thomas told him, there was no objection to the other portions of Guilbert's testimony—namely, that he received a call, that because of that call he called the victim's wife and decided to leave Bella Notte to go to the hospital to check on the victim, and that, approximately fifteen to twenty minutes after those calls, he saw Tyus and another man matching the defendant's description enter Bella Notte. From this evidence, the jury reasonably could have inferred that the victim had been shot prior to the defendant's and Tyus' entering Bella Notte. See, e.g., *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003 (jury is permitted to draw inferences from evidence admitted at trial as long as those inferences are reasonable), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). Even without the contested statement, the jury nevertheless would have been able to reasonably infer that Tyus and the defendant arrived at Bella Notte after the victim was shot because Guilbert consistently stated that, although he thought the two men arrived at about 11 p.m., he was not looking at his watch, but they arrived after the two phone calls.

We recognize that, although reasonable, these infer-

ences would not be as strong if the jury had heard Charlene Thomas' statement that the victim had been shot. Contrary to the defendant's contention, however, Charlene Thomas' statement to Guilbert was not the only evidence that established the state's time line of events. The defendant's argument presumes that the records of Tyus' historical CSLI should have been suppressed. But, as discussed in part I B 1 of this opinion, those records may be considered in determining whether any error, constitutional or evidentiary, harmed the defendant. Those records, coupled with the defendant's own admission that he was with Tyus on the night of the shooting, establish that the defendant was near Ernie's Café at the time of the shooting and that only then did he and Tyus travel north to Norwich, arriving near Bella Notte at approximately 12:45 a.m. Additionally, as discussed in part I B 2 of this opinion, there was substantial other evidence admitted at trial that established the defendant's guilt. Thus, even if the contested statement was inadmissible hearsay, it did not substantially affect the jury's verdict.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* March 23, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] At trial, Cindalee Torres, the mother of Tyus' son, testified that she also went to the hospital to check on Tyus and that, while there, overheard the defendant state that "we're gonna get them niggas . . . ." She also testified, however, that she never met or saw the defendant prior to that night in the hospital. On appeal to the Appellate Court, the defendant claimed that Torres improperly identified him as the speaker of this overheard statement for the first time in court in violation of *State* v. *Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016), cert. denied,      U.S.     , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). The Appellate Court agreed, holding that the identification was improper but that the error was harmless. *State* v. *Armadore*, 186 Conn. App. 140, 156–58, 198 A.3d 586 (2018). The defendant did not seek certification to appeal as to this issue. Thus, for purposes of our review, we do not consider Torres' testimony that she heard the defendant make this statement.

[2] Both the defendant and Tyus also were charged with conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, but those charges were later dismissed on the ground that they were barred by the statute of limitations.

[3] Tyus has filed a separate appeal, which is pending in this court under Docket No. SC 20462.

[4] The Appellate Court held that (1) the trial court did not abuse its discretion by granting the state's motion to join the defendant's trial with that of Tyus, (2) the defendant's constitutional right to confrontation was not violated when a state firearms examiner testified about the findings and conclusions made by another firearms examiner who was unavailable to testify, (3) although the defendant was improperly identified for the first time in court by Torres as the speaker of a statement she overheard at the hospital where she went to check on Tyus after he had been shot, this error was harmless; see footnote 1 of this opinion; and (4) the defendant's general objection to the alleged hearsay testimony of Guilbert was insufficient to preserve his claim for review. See *State* v. *Armadore*, supra, 186 Conn. App. 145, 151, 156, 158, 160.

[5] We declined to grant the defendant certification to appeal as to whether the trial court violated his right to confrontation by admitting expert testimony from a state firearms examiner; see footnote 4 of this opinion; and whether this court should adopt the doctrine of cumulative error. The defendant did not seek certification to appeal on the issue of whether the trial court improperly granted the state's motion to join his trial with that of Tyus.

[6] We note that there was an objection to the labeling on the printout of

Wines' slideshow presentation that identified the defendant by name in relation to the cell phone numbers from which calls were made and received on the night of the shooting. The trial court sustained the objection, and the state had Wines redact the defendant's name insofar as it concerned to whom the cell phone numbers were registered or by whom they were used. The printout thus showed only which cell phone numbers were activated and where and when they were activated. However, there was other evidence admitted at trial that established that one of these phone numbers was connected to a cell phone registered to the defendant and that the other two phone numbers were connected to cell phones registered to or used by Tyus.

[7] As to the ex parte orders concerning the defendant's prospective CSLI, we held that "[t]he state's concession that the prospective orders were issued in violation of § 54-47aa resolves that question for the two prospective orders." *State* v. *Brown*, supra, 331 Conn. 271.

[8] We note that there is some debate among courts in some jurisdictions regarding whether the retroactivity rule in *Griffith* is meant to trump state appellate procedural rules. Some courts have held that this rule does not trump procedural rules, and, thus, a defendant may not raise a claim premised on a new constitutional rule—even if his case was pending at the time the rule was announced—if he failed to raise the claim before the trial court or in his initial appeal. See *United States* v. *McCrimmon*, 443 F.3d 454, 461–63 (5th Cir.) (defendant failed to raise claim on direct appeal), cert. denied, 547 U.S. 1120, 126 S. Ct. 1931, 164 L. Ed. 2d 679 (2006); see also *United States* v. *Levy*, 391 F.3d 1327, 1332 (11th Cir. 2004) (Hull, J., concurring in the denial of rehearing en banc) (request for rehearing en banc was denied because defendant failed to comply with rule requiring that all issues must be raised in initial appellate brief).

Other courts have permitted review under the federal plain error doctrine embodied in Fed. R. Crim. P. 52 (b) or rejected arguments that a defendant " 'waived' a claim based on a then-recent Supreme Court decision by failing to object at trial or advance the claim in his initial brief." *United States* v. *Levy*, supra, 1342 (Tjoflat, J., dissenting from the denial of rehearing en banc); id., 1342–43 (Tjoflat, J., dissenting from the denial of rehearing en banc) (discussing cases in which claims were considered under plain error standard); see also *United States* v. *Pree*, 408 F.3d 855, 874 (7th Cir. 2005) (claim premised on new rule announced after defendant filed original briefs on appeal reviewed for plain error despite defendant's having failed to raise claim at trial or in original appellate briefs); *United States* v. *Delgado*, 256 F.3d 264, 280 (5th Cir. 2001) (plain error review afforded claim raised pursuant to new rule announced in *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when claim was first made in supplemental brief after defendant failed to object at sentencing or to raise issue in initial appellate brief); *United States* v. *Cernobyl*, 255 F.3d 1215, 1216, 1218 (10th Cir. 2001) (same); cf. *United States* v. *Rogers*, 118 F.3d 466, 471 (6th Cir. 1997) (claim failed to meet requirements for review of plain error).

Thus, courts in some jurisdictions have held that a defendant's failure to preserve a *Carpenter* claim at trial prevents review of that claim, despite the fact that the new rule was not announced until after the defendant's trial but while the case remained pending. See *State* v. *Lewis*, Docket Nos. A-2411-15T3, A-2550-15T1 and A-2551-15T3, 2019 WL 149907, *6 (N.J. App. Div. January 7, 2019) (declining to review unpreserved *Carpenter* claim even though appeal was pending when *Carpenter* was released), cert. denied, 238 N.J. 432, 211 A.3d 723 (2019), and cert. denied, 238 N.J. 433, 211 A.3d 724 (2019), and cert. denied, 238 N.J. 437, 211 A.3d 726 (2019); *People* v. *Crum*, 184 App. Div. 3d 454, 455, 126 N.Y.S.3d 7 (holding that failure to preserve *Carpenter* claim at trial precluded appellate review even though *Carpenter* was decided after defendant's conviction), appeal denied, 35 N.Y.3d 1065, 152 N.E.3d 1206, 129 N.Y.S.3d 404 (2020).

In light of this court's *Golding* jurisprudence, which permits review of unpreserved constitutional claims, we need not join the fray to determine whether *Griffith* was intended to trump state procedural rules.

[9] The state does not argue that the defendant waived his unpreserved *Carpenter* claim under *Golding*'s third prong. See, e.g., *State* v. *Foster*, 293 Conn. 327, 337–38, 977 A.2d 199 (2009) ("For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel [such as consenting to or expressing satisfaction with the ruling at issue]." (Internal quotation marks omitted.)).

[10] As part of this argument, the state contends that, because the defendant failed to raise a *Carpenter* claim in his initial appeal, the claim is abandoned

and that, under our procedural default rule, he has no right to review unless he establishes that prior law made the claim unavailable to him. See *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 71, 136 A.3d 596 (2016) (discussing procedural default standard applied in habeas corpus cases); see also *United States* v. *David*, 83 F.3d 638, 644–45 (4th Cir. 1996) (as exception to procedural default rule, defendant may raise unpreserved claim based on new constitutional rule if claim would have been implausible before new rule).

The state appears to conflate our procedural default rule and the first exceptional circumstance articulated under *Evans*. To the extent that the state conflates these doctrines, as we explain in this opinion, the *Golding* standard fully replaced the *Evans* standard, and, thus, to be entitled to *Golding* review, the defendant is not required to establish that his unpreserved constitutional claim was not readily foreseeable. To the extent that the state attempts to apply the procedural default rule to the circumstances of this case, we note that this court normally applies the procedural default rule on collateral review. We have been unable to find any cases in which we have applied this rule on direct review, and, thus, we decline to do so now.

[11] Although none of these cases explicitly addresses whether the new rule at issue had to be "not readily foreseeable" to entitle a litigant to review under *Golding*, two of these cases involved unpreserved claims that were at least arguably foreseeable. See *State* v. *Correa*, supra, 185 Conn. App. 322–23 n.10 (unpreserved claim based on recent rule announced in *State* v. *Kono*, supra, 324 Conn. 93, which did not reverse any established precedent but, rather, followed existing case law from United States Court of Appeals for Second Circuit); *State* v. *Shinn*, supra, 47 Conn. App. 408–409 (affording *Golding* review to unpreserved claim, which was based on new rule that arguably was not unforeseeable or that applied established rule to new set of facts); *State* v. *Shinn*, supra, 419–20 (*Foti*, *J.*, dissenting) (concluding that, contrary to defendant's claim, new constitutional right was not created while his case was pending and that right that defendant claimed was violated was readily foreseeable to him).

We note that, although this court granted certification to appeal in *Correa* on the issue of whether, under *Kono*, article first, § 7, of the Connecticut constitution prohibits the police from conducting a warrantless canine sniff of the exterior door to a motel room for the purpose of detecting the presence of illegal drugs inside the room; see *State* v. *Correa*, 330 Conn. 959, 959–60, 199 A.3d 19 (2019); no party challenges the applicability of *Golding* to the unpreserved claim in *Correa*.

[12] Additionally, as noted previously, the retroactivity rule in *Griffith* ensures that similarly situated defendants are treated equally. *Griffith* v. *Kentucky*, supra, 479 U.S. 323. This principle is particularly important in the present case, as Tyus, likewise, has an appeal pending before this court under Docket No. SC 20462, in which this court granted certification to appeal regarding the merits of his *Carpenter* claim; see *State* v. *Tyus*, 335 Conn. 907, 227 A.3d 77 (2020); although he, too, raised this claim after oral argument in the Appellate Court in a motion for permission to file a supplemental brief, which was denied.

[13] The defendant also argues that the Appellate Court abused its discretion by denying his motion to supplement the record. Because the defendant's claim would fail under the fourth prong of *Golding* even if we were to assume that the record was adequate for review, we hold that, to the extent that the Appellate Court abused its discretion by denying the defendant's request to supplement the record, the error was harmless.

[14] We note that, in his petition for certification to appeal, the defendant did not seek to challenge the trial court's granting of the state's motion to join his trial with that of Tyus.

[15] In his supplemental brief concerning whether this court may consider Tyus' historical CSLI in determining harm under *Golding*'s fourth prong, the defendant, for the first time, raises a claim that this court, in determining harm, also cannot consider Ebrahimi's testimony that, on the night of the shooting, the defendant told her that he had shot someone because Ebrahimi's testimony constituted a fruit of the poisonous tree.

Specifically, the defendant contends that Ebrahimi made this statement only years later, after Detective Curcuro showed her his case file, which would have included the defendant's historical CSLI, thereby reminding her that the defendant had been with other women that night and giving her motive to fabricate her testimony. The state has moved to strike this portion of the supplemental brief, arguing that it went beyond the scope of the question on which this court requested supplemental briefs from the parties. We agree with the state that this claim is beyond the scope of any of the

questions we certified for review or our request for supplemental briefs, and we decline to address it.

Nevertheless, we note that the connection between the defendant's historical CSLI and Ebrahimi's statement inculpating the defendant is so attenuated as to dissipate any taint. Ebrahimi already knew that the defendant had been with other women that night; it was not news to her. And, at the time of her statement, Detective Curcuro's file had significant other evidence showing that the defendant was with other women that night. See *State* v. *Spencer*, 268 Conn. 575, 599–600, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004).

[16] We note that there are certain limited exceptions to this rule, such as third-party standing, but that none has been asserted in the present case. See *State* v. *Bradley*, 195 Conn. App. 36, 51, 223 A.3d 62 (2019), cert. granted, 334 Conn. 925, 223 A.3d 379 (2020).

[17] See General Statutes § 54-47aa (a) (3) (defining cell site stimulator device).

[18] At the time of the warrantless search, McDonald was inside his room, along with Washington, who was his guest. *McDonald* v. *United States*, supra, 335 U.S. 456.

[19] Although defense counsel on cross-examination tried to show that Ebrahimi had fabricated this confession years after the shooting in response to Detective Curcuro's threats, Ebrahimi responded affirmatively to the prosecutor's question as to whether, "notwithstanding anything that Detective Curcuro may have said" to her, she heard the defendant tell her that he had shot someone.

Additionally, the state rehabilitated her testimony in two ways. First, on redirect examination, the state established that Ebrahimi feared the defendant when he had been drinking or had been mad at her, and that the defendant previously had hit her, which provided an alternative reason for why she did not inform the police sooner about his confession. Second, Ebrahimi testified that, two months after the victim's death, she told her mother that the defendant had shot someone. The state also elicited testimony from Ebrahimi's mother that, near the end of 2006, Ebrahimi told her that the defendant had shot someone and that Ebrahimi "was a mess" about it.

[20] Although defense counsel functionally objected to the contested statement on hearsay grounds, not on relevancy grounds, because we have held that trial courts have an obligation to ensure that statements offered for the effect on the hearer are relevant, and because the prosecutor specified on the record before the trial court why he believed the statement was relevant—to show the effect on Guilbert's subsequent actions—we review both whether the statement was hearsay and whether it was relevant.